# United States Court of Appeals
## For the First Circuit

No. 09-1896

UNITED STATES OF AMERICA,

Appellee,

v.

THOMAS KASENGE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard and Thompson, Circuit Judges.

Jane Elizabeth Lee for appellant.
Renée Bunker, Assistant United States Attorney, with whom
Thomas E. Delahanty II, United States Attorney, was on brief, for
appellee.

November 2, 2011

**HOWARD**, **Circuit Judge**. Defendant-appellant Thomas Kasenge challenges his conviction for aiding and abetting aggravated identity theft, 18 U.S.C. §§ 2, 1028A. He asserts that no identity theft was committed because his identification documents were used with his permission. He also argues that the prosecutor engaged in misconduct during closing argument to the jury. After careful consideration, we affirm.

## I. Background

Thomas Kasenge, a foreign national and lawful permanent resident of the United States, shared a home in Westbrook, Maine with several others, including Ronald and Emily Serunjogi, Pius Mayanja and, for a brief period in early 2008, Anita Mwebe.

Mayanja's visa had expired. In early 2007, unable to obtain work due to his immigration status, he turned to Kasenge for help, seeking food, clothes, and money. Kasenge instead offered, for a nominal fee, the use of his driver's license and social security card to assist Mayanja in securing a job. The scheme was successful, and at various times in 2007 and early 2008, Mayanja worked at a McDonald's restaurant and a Hannaford supermarket under the identity of Thomas Kasenge. Ronald Serunjogi and Mwebe soon learned of the arrangement.

Kasenge and Mwebe had become intimately involved shortly after Mwebe's arrival in January 2008. Their dalliance ended that March when Kasenge traveled to London to visit his fiancée and

-2-

child and Mwebe moved to Chicago to continue her ongoing job search. Communication between them ceased, and within a matter of months, Mwebe had married another man and relocated to North Carolina.

A few weeks after Mwebe's departure, Mayanja was arrested. He was charged, in part, with aggravated identity theft, 18 U.S.C. § 1028A, for his fraudulent use of Kasenge's identifying documents. During the ensuing investigation, Mayanja initially lied to the authorities, claiming that he had never used Kasenge's license or social security card. Mayanja and Ronald Serunjogi also denied that Serunjogi had known about or participated in any of the fraudulent activity. They later recanted, admitting that Mayanja had used the documents, that Kasenge was complicit in the scheme, and that Serunjogi had been aware of the agreement from the outset.

Kasenge was subsequently and separately charged with, among other crimes, aiding and abetting aggravated identity theft, 18 U.S.C. §§ 2, 1028A. At trial, he denied the existence of any agreement, asserting that Mayanja had stolen the documents and used them without his permission. To prove Kasenge's willful participation in the scheme, the government called three witnesses: Mayanja, who testified in exchange for the government's agreement to recommend the dismissal of certain charges and a reduced sentence; Serunjogi, who testified in return for immunity from charges related to his prior false statements; and, to corroborate

their testimony, Anita Mwebe. Upon a successful objection by Kasenge, none of the witnesses was permitted to discuss either Kasenge's fiancée and child or Mwebe's knowledge of the purpose of Kasenge's trip to London.

During the government's closing argument, the prosecutor made the following remarks concerning Mwebe's testimony:

> I'd ask you to consider all of the evidence that you've heard in this case . . . . Consider, for example, the testimony of Anita Mwebe . . . . Ms. Mwebe came in and told you three separate vignettes or little anecdotes about her dealings with Thomas Kasenge. She didn't have an immunity agreement; she didn't have a plea agreement; she didn't have any falsehoods in her past. She . . . came in, told the story about what she knew. And what did she tell you? [. . . .] Miss Mwebe provided you corroboration of what Mr. Mayanja told you. <u>No ax to grind</u>, she lived in that house for two months, she was close with Mr. Kasenge, she was friends with these other people, she lives in North Carolina now, she came in, told you what she saw.

(Emphasis added). Later, in rebuttal to Kasenge's closing argument, which was largely devoted to attacking the credibility of Mayanja and Serunjogi, the prosecutor stated:

> I think [defense counsel] mentioned Anita Mwebe twice, the first time by saying her name, the second time saying if you believe her. Why? There's nothing to say about it other than what you heard from her. Consider the testimony of Miss Mwebe, <u>who came in here without any baggage you heard from other witnesses</u>, came in and told you what she heard and saw when she lived with Thomas Kasenge.

(Emphasis added).

Kasenge was ultimately convicted by a jury and sentenced to 25 months in prison, including a mandatory 24-month term on the count of aiding and abetting aggravated identity theft. This appeal ensued.

## II. Discussion

Kasenge challenges his conviction for aiding and abetting aggravated identity theft, 18 U.S.C. §§ 2, 1028A, on two grounds. First, he contends that because he consented to Mayanja's use of his documents, there was no underlying crime of aggravated identity theft for him to aid and abet. Second, he argues that the government's closing remarks improperly implied that Mwebe was impartial, despite the prosecutor's purported knowledge to the contrary - i.e., that Mwebe had, as Kasenge now suggests, moved to Chicago in a fit of jealous anger. We address each of these claims in turn.

### A. Aggravated Identity Theft

The operative language of the aggravated identity theft statute reads:

> Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, <u>without lawful authority</u>, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years.

18 U.S.C. § 1028A(a)(1) (emphasis added). Kasenge asserts, for the first time on appeal, that the phrase "without lawful authority"

-5-

means without the authority, permission, or consent of the identity's owner; in other words, that the means of identification must be stolen to trigger liability under § 1028A. Accordingly, he argues, because he consented to Mayanja's use of his means of identification, there was no crime of aggravated identity theft for him to aid and abet.[1]

We have rejected this narrow interpretation of § 1028A(a)(1). See United States v. Ozuna-Cabrera, ___ F.3d ___, No. 09-2174 (1st Cir. 2011) (holding that § 1028A(a)(1) does not require theft, or any other illicit method of procurement, of the means of identification). Because most of Kasenge's arguments parallel those that we considered and rejected in Ozuna-Cabrera, we rely primarily on our discussion in that case. However, Kasenge does advance one additional argument not made in Ozuna-Cabrera.

In essence, Kasenge submits that because any transfer, possession, or use of another person's means of identification during and in relation to a § 1028A(c) felony is always illegal, it could never be done with lawful authority under our interpretation of § 1028A, thus rendering the phrase "without lawful authority" redundant. We disagree. It takes little imagination to conceive instances in which a person might transfer, possess, or use another

_____

[1]Because the issue was not raised below, our review is for plain error, United States v. Matos, 531 F.3d 121, 122 (1st Cir. 2008). As we find no error, plain or otherwise, the argument is unavailing under any standard of review.

-6-

person's means of identification, during and in relation to a predicate offense, in a manner that is lawfully authorized.

For example, where an applicant for naturalization submits documentation of a spouse's citizenship, but the applicant fraudulently claims to have committed no crime of moral turpitude, the transfer of the spouse's information is arguably performed with lawful authority, despite its occurrence during and in relation to a predicate offense.  See 18 U.S.C. § 1028A(c)(6) (relating to nationality and citizenship).

Closer to the circumstances of this case, the employees at McDonald's and Hannaford's who possessed Kasenge's identifying documents, transferred them for administrative review, and used them to fulfill various state and federal obligations, did so during and in relation to Mayanja's fraud; yet they acted with lawful authority, and their conduct unquestionably falls outside the ambit of § 1028A.

We need not probe the issue further.  In Ozuna-Cabrera, we held that 18 U.S.C. § 1028A(a)(1) does not require that the means of identification be stolen or otherwise illicitly procured, and Kasenge presents us with no compelling ground for reappraisal. Consequently, his statutory argument fails.

**B. Prosecutorial Misconduct**

Kasenge also takes issue with several statements made by the government in its closing argument to the jury.  He contends

that the phrases "no ax to grind" and "without . . . [the] baggage you heard from other witnesses" improperly bolstered by inference Mwebe's impartiality, despite the prosecutor's alleged knowledge to the contrary - that, as Kasenge now claims, Mwebe's March 2008 move to Chicago was motivated by jealousy arising from Kasenge's trip to London.

Because Kasenge did not object to these statements at trial, we review only whether the prosecutor's conduct constituted plain error. United States v. Hansen, 434 F.3d 92, 101 (1st Cir. 2006). Thus, Kasenge must show that (1) "an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of [the] proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

Even then, reversal would be necessary only if, in light of the entire record, the remarks in the prosecutor's closing argument have "so poisoned the well that the trial's outcome was likely affected." United States v. Henderson, 320 F.3d 92, 107 (1st Cir. 2003). Our assessment requires us to consider: "(1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendants." United States v. Nelson-

-8-

Rodriquez, 319 F.3d 12, 38 (1st Cir. 2003) (quoting United States v. Wihbey, 75 F.3d 761, 771-72 (1st Cir. 1996)).

As a preliminary matter, we note that the appellant, on occasion, characterizes the issue as one of improper witness vouching. A prosecutor improperly vouches for a witness when she "imparts her personal belief in a witness's veracity or impli[es] that the jury should credit the prosecutor's evidence simply because the government can be trusted." United States v. Pérez-Ruiz, 353 F.3d 1, 9 (1st Cir. 2003). The prosecutor's conduct in this case does not fit the bill. See United States v. Cruz-Kuilan, 75 F.3d 59, 62 (1st Cir. 1996) ("Arguing that a witness is speaking the truth because he has reason to do so is not [witness vouching]."); United States v. Rodríguez, 215 F.3d 110, 123 (1st Cir. 2000) ("[A]n argument that does no more than assert reasons why a witness ought to be accepted as truthful by the jury is not improper witness vouching."). The government did not argue, as Kasenge paraphrases, "that . . . Mwebe's testimony must be truthful," "that the jury should believe . . . Mwebe," and "that Mwebe was telling the truth." Rather, the prosecutor merely suggested, as was permissible, that the jury draw inferences of credibility. See Henderson, 320 F.3d at 106 ("[A]lthough it is the jury's job to draw the inferences, there is nothing improper in the Government's suggesting which inferences should be drawn.")

(quoting United States v. Mount, 896 F.2d 612, 625 (1st Cir. 1990))
(internal quotation marks omitted).

Thus, more appropriately framed, the issue is whether the
prosecutor had strong reason to doubt his suggested inference that
Mwebe was indeed impartial, and if so, whether this conduct rises
to the level of plainly erroneous misconduct.  See United States v.
Udechukwu, 11 F.3d 1101, 1106 (1st Cir. 1993) (noting that, in
closing argument, it is error for the government to propound
inferences that it knows to be false, or has a very strong reason
to doubt).

Examining the specific facts here, we find no error.
Nothing in the record supports Kasenge's theory that Mwebe's
departure was motivated by jealousy.  She and Kasenge both
described their relationship in casual terms, and Mwebe was well
aware of Kasenge's familial obligations.  In fact, during Kasenge's
visit to London, Mwebe contacted him to request financial
assistance, which Kasenge promptly provided.  Add to that the
brevity of their involvement, and Mwebe's near-immediate subsequent
marriage and relocation, and we fail to discern how the prosecutor
would have strong reason to know of her alleged jealousy or ill
will.  If Kasenge wanted the jury to infer that Mwebe was jealous,
and therefore partial, he could have introduced such evidence at
trial.  He opted not to do so.  That was a tactical decision, and

-10-

we are unpersuaded by his current attempt to convert that trial strategy into a foundation for appeal.

We needn't go further, but, even if improper, the prosecutor's statements do not require a new trial. See Henderson, 320 F.3d at 107. Kasenge did not contemporaneously object or request a curative instruction. This failure not only suggests that Kasenge did not consider the remarks prejudicial, but also deprived the district judge of the opportunity to resolve any potential confusion. See United States v. Marshall, 109 F.3d 94, 100 (1st Cir. 1997) (noting that in determining whether a prosecutor's closing argument is improper, "an excellent test is whether counsel contemporaneously thinks the line has been crossed, and objects, which, in turn, enables the court to instruct the jury"). The court's general closing instructions, however, did properly counsel the jury regarding what constituted evidence and the fact that they were the sole judges of credibility. Specifically, the court reminded jurors that:

> Arguments and statements by the lawyers are not evidence. The lawyers are not witnesses. [. . . .] If the facts as you remember them differ from the way the lawyers state the facts, it's your memory of the facts that controls. [. . . .] You do not have to accept the testimony of any witness if you find that the witness is not credible. Credible means believable. You must decide which witnesses to believe and which facts are true.

Thus, any potential harmful effect from the prosecutor's closing statement was safeguarded by the district court's final jury instructions. See United States v. Mejia-Lozano, 829 F.2d 268, 274 (1st Cir. 1987) (finding that the district judge's standard instruction was sufficient to overcome any prejudice).

Moreover, the well is deemed less likely to have been poisoned where strong evidence supports the prosecutor's case. United States v. Moreno, 991 F.2d 943, 948 (1st Cir. 1993). Here, the case against Kasenge was ample. The testimony of Mwebe and others was supported by significant corroborating documentary evidence, including the transcript of a telephone conversation in which Kasenge made admissions suggesting that he consented to Mayanja's use of his documents.

On balance, we are convinced that the prosecutor's remarks were neither improper nor prejudicial, and therefore did not deprive Kasenge of a fair trial or a just outcome. Accordingly, we find no reversible error.

### III. Conclusion

For the reasons set forth above, we **affirm** the judgment of the district court.