# United States Court of Appeals
## For the First Circuit

---

No. 13-1061

UNITED STATES,

Appellee,

v.

ISMAEL VÁZQUEZ-LARRAURI, a/k/a El Gordo, a/k/a Junito,
a/k/a Tara,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Selya and Kayatta, Circuit Judges.

---

Paul M. Glickman, with whom Glickman Turley LLP was on brief, for appellant.

George A. Massucco-LaTaif, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Juan Carlos Reyes-Ramos, Assistant United States Attorney, were on brief, for appellee.

---

February 13, 2015

---

**KAYATTA, Circuit Judge**. A jury convicted Ismael Vázquez-Larrauri ("Vázquez") of drug and firearm offenses after a nine-day trial for leading a conspiracy to distribute drugs in Puerto Rico public housing projects. The district court sentenced Vázquez to concurrent life sentences on all six counts of conviction. Vázquez now appeals, arguing that prosecutorial misconduct--primarily improper vouching for a government witness--and evidentiary errors warrant a new trial. He also challenges his sentence, claiming that the district court failed to make an individualized drug quantity finding and that the life sentence on the firearm count exceeded the applicable statutory maximum. Failing all else, he also claims ineffective assistance of trial counsel. We affirm Vázquez's convictions on all counts and his life sentences on the five drug counts, but remand for a modified sentence on the one firearm count. We decline to address his ineffective assistance of counsel claim on direct appeal.

## I. Background

Vázquez does not challenge the sufficiency of the evidence to support his conviction. We recently noted the lack of clear consensus in this circuit whether to recite the facts in the light most favorable to the verdict, or to present the facts in a more balanced or neutral manner, when the defendant does not raise a sufficiency of the evidence claim. United States v. Rodríguez-Soler, 773 F.3d 289, 290 (1st Cir. 2014). Because the

standard used to review the facts would make no difference for this appeal, we decline to decide the issue and instead simply present a neutral version of the facts based on the trial testimony. See id.

The charged crimes in this case arise from a drug trafficking organization's distribution of large quantities of heroin, cocaine, cocaine base ("crack cocaine"), and marijuana through multiple drug points from 1994 until 2008. Trial witnesses testified that Vázquez's initial role in this organization was managing sales at drug points located in the Jardines de Montellano and Luis Muñoz Morales public housing projects in Cayey, Puerto Rico. At first, he shared responsibility for running the drug points with others, including an individual known as Cheo Cabezon. Vázquez and Cheo Cabezon then took over complete control and supply of these two drug points sometime in the 1990s. In 2001, Vázquez expelled Cheo Cabezon from the organization and assumed sole leadership. Vázquez grew his enterprise and eventually either controlled or became the exclusive supplier for additional drug points in the El Polvorín and Las Vegas wards in Cayey, Santa Isabel, Salinas, Coamo, and the Borinquen ward in Guayama.

The government began investigating Vázquez in 2005 and obtained a grand jury indictment against him and seventy other individuals in 2008. The indictment charged Vázquez with six counts: Count I charged conspiring to distribute and/or to possess

with intent to distribute specified quantities of heroin, crack cocaine, cocaine, and/or marijuana, within 1,000 feet of a public housing project, in violation of 21 U.S.C. §§ 841(a)(1), 846, and 860; Counts II-V charged aiding and abetting in possession with intent to distribute heroin, crack cocaine, cocaine, and marijuana within 1,000 feet of a public housing project, in violation of 21 U.S.C. §§ 841(a)(1), 860, and 18 U.S.C. § 2; and Count VI charged conspiring to possess firearms during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(o).[1]

At trial, the government's case depended heavily on the testimony of three cooperating witnesses to establish Vázquez's leadership role in the conspiracy: "L.O.," "J.S.," and "F.R."[2] All three cooperating witnesses testified that Vázquez assumed control and was "the boss" of the drug points. L.O. testified that she joined the charged conspiracy in the 1990s by collecting the "tallies," or money from drug sales, for the drug point at Jardines, where she also lived. Most importantly for this appeal, she testified that Vázquez ordered the murders of three individuals who threatened his control over the drug points: the expelled co-

---

[1] The indictment also contained a forfeiture allegation (Count VII) not at issue in this appeal.

[2] We have assigned initials instead of using real names "in light of concerns about the safety of cooperating witnesses raised by the Committee on Court Administration and Case Management of the Judicial Conference of the United States." United States v. Etienne, 772 F.3d 907, 910 n.1 (1st Cir. 2014).

leader Cheo Cabezon; an ambitious drug seller named Mamart; and L.O.'s son, known as El Arabe. After her son's death in 2004, L.O. became a confidential informant for the government. She was later indicted for her role in the drug conspiracy and testified against Vázquez pursuant to a plea agreement.

J.S. testified extensively about drug quantities distributed through the drug points and the manner in which Vázquez operated the conspiracy. Beginning in 2000 or 2001, J.S. worked for Vázquez's cockfighting operation. J.S. testified that he regularly attended cockfighting matches with Vázquez and fifteen to twenty other individuals. J.S. and the others placed bets of up to $20,000 with money that Vázquez instructed J.S. to collect from the various drug points while working with Hiram Torres-Aviles ("Torres"), who was in charge of tallying drug proceeds and preparing drugs for distribution. After a few months, Vázquez and Torres taught J.S. how to prepare and package the heroin, crack cocaine, cocaine, and marijuana for distribution. J.S., who had trained in accounting, testified in detail about the technique and quantities used to prepare drugs for the various drug points. J.S. testified that he stored kilograms of cocaine and heroin for Vázquez in his Jardines apartment.

J.S. also testified about the enforcement side of the drug conspiracy. He stated that at Vázquez's direction he stored up to 31 firearms, some of them machine guns, and that Vázquez

would order others to use the firearms. J.S. recalled that Vázquez told J.S. that, if he turned on Vázquez, J.S. would end up dead like Cheo Cabezon. J.S. also testified that he was present at the meeting at which Vázquez and other members of the conspiracy decided that El Arabe had to be killed because he was trying to take over the Jardines drug point. J.S. later became a confidential information for the government--for which the government paid him $18,000--and then stopped working for Vázquez in 2006.

F.R. testified pursuant to a plea agreement he had entered for his involvement in a different drug conspiracy. He told the jury that he supplied drugs to and rented the Jardines drug point in the early 1990s, while Vázquez managed the sales at the drug point. F.R. explained that Vázquez and Cheo Cabezon took over the Jardines drug point after F.R. retired in 1995 to run local stores. F.R. maintained contact with cocaine suppliers, however, and, on at least twenty occasions between 1995 and 2006, he used these contacts to supply Vázquez with a half-kilogram or more of cocaine when Vázquez's normal supply ran dry.

The government also presented testimony from fourteen law enforcement agents about controlled drug purchases, arrests, and seizures of money, guns, and drugs at the Jardines and Morales drug

points and at co-conspirators' residences.[3]  None of this testimony directly implicated Vázquez, although at least two of the arrests and seizures were the result of information provided by J.S. and corroborated parts of his testimony.  The lead case agent, Ricardo Cruz-Vázquez, testified about wiretaps obtained on the phones of co-conspirators, including a wiretap on Vázquez's phone.  Vázquez was a participant in some of the recorded conversations played for the jury, but only two arguably involved discussions about the drug operation.[4]  Vázquez called no witnesses in his defense.

---

[3] The parties stipulated as to the types and quantities of drugs seized.  The total quantity seized was 40.427 grams of heroin, 56.33 grams of crack cocaine, 600.23 grams of cocaine, and 265.39 grams of marijuana.

[4] Both phone calls were between Vázquez and an individual known as Pakay.  The first occurred on February 16, 2008, and was translated and transcribed as follows:

[Vázquez]:     Uh, do you already have that money for Barre? It's seven and a half.

Pakay:          Yes. I know it's seven and a half but not until Zandy gives me this.  Remember, I have . . .

[Vázquez]:     Don't be a [expletive.]  It's that I need that money.
. . .
Bring down what you have and . . . at the end, when you're finished you square it off.

The second conversation occurred on February 25, 2008, and was translated and transcribed as follows:

[Vázquez]:     How about that thing? . . . Everything worked out well?

-7-

The jury found Vázquez guilty on all six counts. For the drug offenses, the jury checked off boxes on the verdict form indicating that it found that Vázquez conspired to possess and possessed with intent to distribute the quantities of heroin, cocaine, crack cocaine, and marijuana specified in the indictment and on the verdict form. The district court sentenced Vázquez to concurrent terms of life in prison on all six counts.

On appeal, Vázquez asks us to vacate his conviction based on prosecutorial misconduct, evidentiary errors, and ineffective assistance of counsel, and to set aside his sentence based on a lack of individualized drug quantity finding and because the life sentence on the firearm count exceeded the statutory maximum. We address each argument in turn.

## II. Standard of Review

With one exception that we note below, Vázquez failed to raise below the errors he now asserts on appeal. We review these unpreserved claims for plain error, and thus require Vázquez to meet the "heavy burden" of showing "(1) that an error occurred; (2) that the error was clear or obvious; (3) that the error affected his substantial rights; and (4) that the error also seriously

Pakay:          I worked everything heavy weight.

[Vázquez]:      Yeah.

Pakay:          We up to the kilo, forget it.
                Everything's very well.

-8-

impaired the fairness, integrity, or public reputation of judicial proceedings."  United States v. Colon, 744 F.3d 752, 757 (1st Cir. 2014) (internal quotation marks omitted).

### III. Analysis

**A. Prosecutorial Misconduct**

Vázquez first directs us to several remarks by the prosecutor during the opening statement and closing argument that Vázquez claims were prosecutorial misconduct.  Having not objected at trial to any of these remarks, he concedes that the plain error standard applies.  See United States v. Kasenge, 660 F.3d 537, 541 (1st Cir. 2011).  In the context of prosecutorial misconduct, we reverse only if the prosecutor's remarks "so poisoned the well that the trial's outcome was likely affected." Id. at 542 (internal quotation marks omitted).  We make this determination considering the following factors: "(1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant[]." Id. (internal quotation marks omitted).

## 1. Witness Vouching

Vázquez's first charge of prosecutorial misconduct is that the prosecutor improperly vouched for L.O.'s credibility during the government's initial closing argument. Improper vouching encompasses statements by the prosecutor that "place[] the prestige of [the prosecutor's] office behind the government's case." United States v. Pérez-Ruiz, 353 F.3d 1, 9 (1st Cir. 2003). The precise line between improper vouching and permissible argument is a "hazy one." United States v. Vizcarrondo-Casanova, 763 F.3d 89, 96 (1st Cir. 2014) (internal quotation marks omitted). We therefore begin by describing a few types of argument that fall fairly clearly on either side of that line.

It is generally permissible for the government to offer specific "reasons why a witness ought to be accepted as truthful by the jury." United States v. Rodríguez, 215 F.3d 110, 123 (1st Cir. 2000) (not improper for prosecutor to argue that cooperating witness was credible because his testimony put him and his family in danger). One such reason is that the witness testified pursuant to a plea agreement that required the witness to testify truthfully to receive the benefit of the bargain. See, e.g., United States v. Hansen, 434 F.3d 92, 101-02 (1st Cir. 2006) (not improper for prosecutor to remind jury that witness testified that he agreed to tell the truth in a plea agreement); United States v. Henderson, 320 F.3d 92, 106 (1st Cir. 2003) (same). Another proper

-10-

credibility argument is that a witness would have told a better, more consistent story if the witness had been lying, see, e.g., Pérez-Ruiz, 353 F.3d at 9-10 ("If they were all going to get up and make up a story, wouldn't it have been a better story?"), at least as long as the argument does not assert that the lack of consistency was viewed as a sign of credibility by the government itself, see Vizcarrondo-Casanova, 763 F.3d at 96 (possibly error, but not clear or obvious error, when prosecutor's statement that "the Government knew that the [witnesses'] versions were going to conflict" could have been understood as "a suggestion that the government itself concluded that the stories were credible.").

In contrast, several forms of credibility argument plainly cross over into improper vouching. The first form occurs when the prosecutor tells the jury that the prosecutor takes personal responsibility or ownership of the case and thus directly places the government's credibility at issue. See, e.g., United States v. Rojas, 758 F.3d 61, 64 (1st Cir. 2014) ("[I]f you have any issues with the way this investigation was run, blame me. I'm in charge. I'm responsible."); United States v. Josleyn, 99 F.3d 1182, 1197 (1st Cir. 1996) ("I'm a married person with a family, and I go home at night with a sound conscience. I have worked very hard on this case. . . . And we are very proud of what we have done. We have done nothing to be ashamed of."). The second form of prohibited vouching occurs when the prosecutor "impart[s] her

personal belief in a witness's veracity," Pérez-Ruiz, 353 F.3d at 9, or in the defendant's guilt, see United States v. Andújar-Basco, 488 F.3d 549, 560-61 (1st Cir. 2007) ("I feel comfortable and the United States feels comfortable that they have proven beyond a reasonable doubt that this man delivered five kilograms of cocaine."). Bare assertions that a witness was honest or correct are therefore improper. See, e.g., United States v. Rodríguez-Adorno, 695 F.3d 32, 40 (1st Cir. 2012) ("Was [the passenger] credible? Was he honest? Of course, he was." (alteration in original)); United States v. Gomes, 642 F.3d 43, 46 (1st Cir. 2011) (telling a jury that a police detective "gave you honest, candid, truthful testimony" (emphasis removed)); United States v. Castro-Davis, 612 F.3d 53, 67 (1st Cir. 2010) ("I think [the identity witness's] testimony was very clear . . . . It seems to me, and I submit to you, that [the witness] is right on the money." (emphasis removed)).

It is this latter form of improper vouching--the personal assurance of a witness's credibility--that Vázquez accuses the prosecutor of employing during his initial closing argument. The alleged vouching, emphasized and accompanied by the surrounding argument, went as follows:

> Now, let's talk about [L.O.]. She had a third grade education. I submit to you she was a difficult witness, difficult to get her story out. Difficult to get from her the things that she had to tell. You saw her on the stand, you were able to evaluate her credibility.

> And I ask you, was she telling you the truth? I submit to you that she was.
>
> Now, do you think she minimized things? Do you think she didn't want to tell you about the verdugo brand of drugs? Possibly. Possibly. But is there any doubt that she was a member of [Vázquez's] conspiracy, beginning in the early 1990s, all the way up until 2004?
>
> There should be no reasonable doubt based on the evidence you heard of her participation, and more particularly, of this Defendant's involvement in a conspiracy, and when it began . . . . You heard that testimony. You remember that.

Vázquez argues that the emphasized language improperly conveyed to the jury the prosecutor's personal opinion that L.O. was truthful.

We doubt the foregoing statement amounted to improper vouching. The prosecutor did not claim to think or believe the point asserted. Cf. Castro-Davis, 612 F.3d at 67. Also, the prosecutor's words as printed on the page are ambiguous. "Submit" can mean "to present or propose to another for review, consideration or decision." Merriam-Webster's Collegiate Dictionary 1244 (11th ed. 2012). In this sense, it is unobjectionable. See Hansen, 434 F.3d at 102 ("[Witness's] [plea] deal here is to tell the truth, and I submit to you, that is precisely what he did during this trial," was not improper vouching); United States v. Marshall, 109 F.3d 94, 100 (1st Cir. 1997) ("They say, I submit to you, they have told the story the way it truly unfolded," was not improper). "Submit" can also mean "to put forward as an opinion or contention." Merriam-Webster's Collegiate Dictionary 1244 (11th ed. 2012). Whether a juror would

hear the spoken words as conveying a proposition for review, or conveying what the prosecutor himself thinks, likely depends on tone, context, and the juror's disposition.

Defense counsel heard the prosecutor's tone, in context. His lack of any objection suggests that neither tone nor context pointed toward vouching. See Marshall, 109 F.3d at 100 ("[A]n excellent test [for determining whether the prosecutor's statement was a personal endorsement] is whether counsel contemporaneously thinks the line has been crossed, and objects, which, in turn, enables the court to instruct the jury."). The prohibition against vouching is widely understood by defense counsel, the objection is easy to make, and the collateral effects of scoring a correction in the prosecutor's closing are often advantageous for the defendant.

Even on the cold page, context suggests that the message as conveyed and received was not one of personal vouching. The prosecutor's immediately preceding statement ("[y]ou saw her on the stand, you were able to evaluate her credibility") drew the jurors' attention to its proper focus--their evaluation of L.O.'s credibility based on their observations during her testimony. And immediately afterward the prosecutor anticipated and addressed the

defense's point that L.O. minimized her involvement in the conspiracy.[5]

In sum, the prosecutor's statement upon which Vázquez principally bases his argument was likely not vouching,[6] and in any case was not clearly or obviously vouching. See Vizcarrondo-Casanova, 763 F.3d at 96 ("While the prosecutor unwisely put his toes up to the line, if there was error it was not 'clear and obvious.'"). For that reason alone we must reject this grounds for appeal.

### 2. Comment on Failure to Testify

Vázquez next argues that during rebuttal the prosecutor improperly commented on Vázquez's decision not to testify. See United States v. Wihbey, 75 F.3d 761, 769 (1st Cir. 1996). The challenged comment came in response to defense counsel's closing

---

[5] The prosecutor developed this point in rebuttal, and in doing so emphasized to the jury that it alone was to determine the truthfulness of L.O.'s testimony:

> You can determine whether [L.O.] was completely lying, whether she was shading the truth, or whether everything that she said was the truth. That's your job as jurors. . . . And I submit to you the evidence of [L.O.] that she presented to you is telling. You can make the determinations of where she shaded and where she was a little hesitant. Make those determinations.

[6] We also reject Vázquez's additional contention that the prosecutor somehow vouched for the witness when he pointed out her lack of education, thereby implying, says Vázquez, that she could not have made up a lie. As we have already noted, supra, there is nothing wrong with pointing out facts that may be viewed as bearing on credibility. See Rodríguez, 215 F.3d at 123.

-15-

argument, which focused on the government's three main witnesses--L.O., J.S., and F.R.--and what those three witnesses had to gain by testifying.  The prosecutor then began his rebuttal as follows:

> Members of the jury, I submit that in response to defense counsel said [sic], if this were such a simple case, why are [sic] we here two weeks? . . .
>
> I submit to you that the witnesses that you heard and the testimony you heard and the evidence that you heard took two weeks to get in before you.
>
> The three witnesses, the three key witnesses, there weren't three witnesses against the Defendant, members of the jury.  There were 17, 18, 19, 20, 21 witnesses--I don't have the exact count.  <u>But every witness that came and testified before you was a witness against the Defendant</u>; every police officer, every agent, every cooperating defendant, every cooperating witness.  <u>Every one of them was a witness against the Defendant</u>.  Not just three.

(emphasis added).

It is well-established that "[c]omment by a prosecutor on a defendant's failure to testify violates the Fifth Amendment guarantee against self-incrimination."  <u>Wihbey</u>, 75 F.3d at 769 (citing <u>Griffin</u> v. <u>California</u>, 380 U.S. 609, 615 (1965)).  When a statement is not obviously a comment on the defendant's failure to testify, we ask "[w]hether, in the circumstances of the particular case, the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."  <u>United States</u> v. <u>Newton</u>, 327 F.3d 17, 27 (1st Cir. 2003) (quoting <u>United States</u> v. <u>Glantz</u>, 810 F.2d 316, 322 (1st Cir. 1987)).

-16-

In context, the prosecutor's comment was not improper. See United States v. Sepulveda, 15 F.3d 1161, 1187 (1st Cir. 1993) ("In assaying the appropriateness of a prosecutor's remarks, context frequently determines meaning."). Although in isolation the statement "every witness that came and testified before you was a witness against the Defendant" might support the negative inference that Vázquez did not himself testify, this was not the comment's "manifestly intended" or "natural[] and necessar[y]" meaning when read in the context of the defense's closing argument. Newton, 327 F.3d at 27. We will "not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." United States v. Taylor, 54 F.3d 967, 979 (1st Cir. 1995) (internal quotation marks omitted). This is especially true when the ambiguous remark draws no objection, as was the case here. Id. ("We are especially reluctant to 'fish in the pool of ambiguity' when . . . the complaining party failed to bring a dubious comment, easily corrected on proper notice, to the immediate attention of the trial court." (quoting Sepulveda, 15 F.3d at 1188)). The more natural, plausible interpretation of the prosecutor's statement is simply that he was rebutting the claim that the government's case rested on the testimony of only three witnesses.

In any event, even if the prosecutor's comment had crossed the line, it would not rise to the level of plain error. The district court gave the jury clear instructions on Vázquez's right not to testify and the burden of proof.[7] These instructions, and the significant evidence of Vázquez's guilt, made it unlikely that the prosecutor's statement affected the outcome of the trial. See Wihbey, 75 F.3d at 770-71.[8]

_____

[7] The relevant jury instructions were as follows:

> Members of the jury, a defendant has a Constitutional right not to testify, and therefore, no inference of guilt or of anything else may be drawn from the fact that the Defendant does not testify.

> For any of you, the jurors, to indulge in such an inference would be wrong. Indeed, it would be a violation of your oath as a juror. The fact that Mr. Ismael Vázquez-Larrauri did not testify or offer any evidence must not be considered by you in any way, or even discussed by any of you during your deliberations.

> I remind you, members of the jury, that it is up to the Government to prove the Defendant, Ismael Vázquez-Larrauri, guilty beyond a reasonable doubt. It is not up to the Defendant to prove that he is not guilty.

[8] To the extent Vázquez further contends that the challenged comment impermissibly shifted the burden of proof, this argument also fails. See United States v. Glover, 558 F.3d 71, 77 (1st Cir. 2009). Ascribing a burden-shifting meaning to the prosecutor's comment is even more of a stretch than interpreting it as a comment on Vázquez's failure to testify.

### 3. Duty to Acquit

During the initial closing, the prosecutor told the jurors, "I ask you and I advise you it's your duty as jurors, if you have reasonable doubt, you must acquit [Vázquez], you must acquit him. That's your job." Vázquez argues that advising the jury of its duty somehow inflamed its passions and interfered with its impartiality. We disagree. There is nothing wrong with the government asking the jury to acquit if it finds the government failed to meet its burden, and the court in fact instructed the jury to do the same.[9] Cf. United States v. Ayala-García, 574 F.3d 5, 17-18 (1st Cir. 2009) (it was inappropriate for the prosecutor, after several inflammatory remarks, to tell the jury, "I charge you to do your job, find the Defendants guilty.").

### 4. Misstating the Evidence

For the remaining challenged comments, Vázquez essentially complains the prosecutor misstated or exaggerated the evidence in the record. Several of these challenges are perfunctory, undeveloped, and therefore waived. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). In any event, we find none of these comments improper and briefly address each in turn.

---

[9] The court instructed the jury that, "if after a fair and an impartial consideration of all the evidence you have a reasonable doubt as to the Defendant's guilt of a particular offense, it is your duty to acquit him of that offense."

Vázquez first challenges a statement during the government's initial closing argument that "[Vázquez] got rid of anybody that represented a threat to him, beginning with Cheo, continuing with Mamart, and El Arabe. That's how the drug trafficking organization worked." Vázquez argues that the use of "anybody" was an unsupported extrapolation from the three murders in evidence and referred to the excluded evidence of other murders, but this statement merely summarized the testimony of L.O. and J.S. that Vázquez got rid of all three of the threats that they testified about--Cheo Cabezon, Mamart, and El Arabe. J.S. testified that Vázquez told him much the same thing, "that whoever would be against him, the same thing would happen to that person than [sic] to the ones who are dead."

Vázquez next challenges the prosecutor's promise during his opening statement that the jury would "hear what happened to [L.O.'s] son [El Arabe] at the hands of [Vázquez]." Although Vázquez correctly notes that there was no evidence that he killed El Arabe literally with his hands, both L.O. and J.S. testified that Vázquez ordered El Arabe killed. It was therefore hardly impermissible to make the figurative argument that El Arabe died "at the hands of" Vázquez when killed by Vázquez's crony at his behest. Vázquez similarly challenges the prosecutor's statement during the initial closing argument that "[L.O.] got up here and testified that this man here, Ismael Vázquez, destroyed her life,

that's what she testified, he destroyed her life. . . . [T]hat's why [L.O.] says the Defendant destroyed her life, because her son never made it to Christmas 2004." This merely restated L.O.'s admissible testimony, see infra, that Vázquez ordered her son's death and in doing so "destroyed [her] life."

Finally, Vázquez challenges two of the prosecutor's comments to the jury about drug quantity. First, during the opening statement, the prosecutor referred to Vázquez as "the largest drug dealer in Cayey." Vázquez argues that there was no basis for this comment because there was no evidence of other drug dealers' sales in Cayey during this time. It would be reasonable to infer that Vázquez was the largest drug dealer in Cayey, however, given the testimony that he controlled "the mega drug point[]" at Jardines, which was "the largest . . . housing project of Cayey," as well as drug points at Morales and El Polvorín in Cayey, and that he ordered potential competitors killed. In any event, we doubt the jury would have changed its verdict if it turned out he was the second- or third-largest dealer in the area. Similarly, we find nothing objectionable in the prosecutor's plausible suggestion that the total quantity of drugs distributed over the fourteen years of Vázquez's leadership was greater (probably significantly greater) than that distributed over a three-year snapshot.

## B. Evidentiary Challenges

### 1. The Murder Testimony

Two of the government's cooperating witnesses, L.O. and J.S., testified that Vázquez ordered the killings of three individuals--L.O.'s son El Arabe, Cheo Cabezon, and Mamart--who posed a threat to his drug points. The district court refused to admit additional testimony or evidence about these three murders or any evidence about two other murders. Vázquez argues that this testimony was inadmissible because "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.

We review preserved evidentiary challenges for an abuse of discretion. Vizcarrondo-Casanova, 763 F.3d at 94. Vázquez did object at sidebar before J.S.'s testimony about the murders of El Arabe and Cheo that such testimony would be unfairly prejudicial. He failed to timely object, however, to L.O.'s earlier testimony about the three murders. We therefore review the admission of her testimony for plain error. Regardless of the standard of review, however, "[o]nly rarely and in extraordinarily compelling circumstances will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." Id. (alteration in original) (internal quotation marks omitted).

There are no such compelling circumstances here, under either abuse of discretion or plain error review. The indictment charged that it was "part of the manner and means of the conspiracy that some of the co-conspirators would use violence, force and intimidation against members of their own drug trafficking organization and rivals in order to maintain control of the drug trafficking operations." Both witnesses testified that Vázquez ordered the murders because Vázquez viewed the victims as threats to his control over the drug points. The district court correctly determined that this testimony was highly probative to show the manner in which the drug conspiracy operated and the way its members furthered its goals, as charged in the indictment. See United States v. Rivera Calderón, 578 F.3d 78, 96 (1st Cir. 2009). More importantly, the testimony showed that Vázquez led the conspiracy by enforcing its rules and protecting it from internal and external threats. See id.

Nor did any unfair prejudice from this testimony substantially outweigh its probative value. The murder evidence was limited to testimony from the first two witnesses in a nine-day trial and was not overly graphic.[10] There was no testimony from

_____

[10] The most graphic testimony came from L.O. In describing her son's death, she said, "I pick up my son. He tells me to stand him up, that he was bleeding out too much in the upper part of the leg through a vein." With regard to Mamart's death, she testified, "Well, you could feel a whole bunch of shooting. You could just hear a whole mess of shooting. And we went downstairs where everybody was screaming. Mamart was already on the ground and he

-23-

ballistics experts, pathologists, or crime scene investigators. Cf. id. at 98-99 (such testimony was not unfairly prejudicial in drug conspiracy case). The only photographs the jury saw were of El Arabe's body (cleaned, apparently in a morgue, and used for identification purposes) and the bloody stairwell where he was shot. Moreover, after the government elicited testimony from L.O. about her son's death, the district court took steps to screen for unfair prejudice by requiring the prosecutor to first make a proffer of any further murder testimony. There was no abuse of discretion or plain error in admitting this testimony.

### 2. Leading Questions

Vázquez also claims that the government improperly used leading questions during the direct examinations of two of its witnesses, L.O. and Agent Cruz-Vázquez. Because Vázquez did not object to any of the questions he now challenges on appeal, we review for plain error. Federal Rule of Evidence 611(c) provides that "[l]eading questions should not be used on direct examination except as necessary to develop the witness's testimony." We afford the district court "extensive discretion over the phrasing of questions," because "the trial judge is best situated to strike a practical and fair balance." Hansen, 434 F.3d at 105 (internal quotation marks omitted).

---

was already dead, with his head sort of squished by the shots."

Vázquez cites two examples of allegedly improper leading questions during L.O.'s testimony. The first question was not even leading--the prosecutor merely referenced in his question L.O.'s prior testimony that Vázquez fired Cheo Cabezon from the drug conspiracy.[11]  In the second example, the prosecutor led L.O. through some basic arithmetic to clarify the year her son died.[12] This was hardly improper.  United States v. Mulinelli-Navas, 111 F.3d 983, 990 (1st Cir. 1997) (not always improper for prosecutor to use leading questions "to assist in developing coherent

---

[11]  The exchange between the prosecutor, L.O., and the court went as follows:

Q.          Now, Cheo, you testified was one of the
            leaders, correct?

A.          Yes.

Q.          Do you know why--you testified yesterday
            also that he was kicked out.

A.          Yes.

. . . .

The Court:  Don't become a witness . . . .

[Prosecutor]: Your Honor, I was just recapping the
            testimony from yesterday.

The day before this exchange, L.O. had testified that Vázquez "fired" Cheo Cabezon.

[12] L.O. could not remember whether her son had died in 2004 or 2005, but knew that the seventh anniversary of his death had been in December 2011.  (She testified in 2012.)  Vázquez takes issue with the prosecutor's clarifying question: "So would you agree with me that 11 minus 7 is 4, and so it would be 2004?"

-25-

testimony").  Although the government did use leading questions with Agent Cruz-Vázquez, these questions laid a foundation for playing wiretap recordings.  The district court did not err, let alone clearly or obviously err, in allowing these questions, and in any event Vázquez faces "an insurmountable hurdle" on plain error review because he has made no "effort to show that such error likely affected the outcome below."  Hansen, 434 F.3d at 105.

## C. Sentencing Challenges

Vázquez challenges his life sentences primarily on the basis that the district court committed plain error in failing to make an individualized finding on drug quantity when determining the Guidelines Sentencing Range.  He also makes a fleeting, passing assertion that a life sentence exceeds the "maximum penalty" for the firearm offense (Count VI).  We address each contention in turn.

### 1. Guidelines Calculation

Vázquez's Presentence Investigation Report (PSR) recommended that he be held accountable for at least 48 kilograms of heroin and 48 kilograms of crack cocaine based only on a four-year sample of the conspiracy.  This recommendation was based on "information made available by the U.S. Attorney's Office."  The PSR also noted that according to testimony at trial, Vázquez used his farm to store and sell drugs by the kilogram.  Vázquez did not file any written objections to the PSR.

-26-

At sentencing, the district court grouped together the five drug offenses, see U.S.S.G. § 3D1.2(d), and the firearm offense, see id. § 3D1.2(c), to determine Vázquez's Base Offense Level of 38.[13] The district court made no specific finding on drug quantity and did not state that it was relying on the PSR's finding that Vázquez was responsible for at least 48 kilograms each of heroin and crack cocaine. Instead, the district court simply announced that

> The guideline for a 21 U.S. Code, section 846, offense is found in Guideline Section 2D1.1, which provides that offenses involving in excess of 30 kilograms of heroin and in excess of 8.4 kilograms of crack cocaine, have a base offense level of 38 under Guideline Section 2D1.1(c)(1).

The district court then applied twelve levels of enhancement[14] to arrive at a Total Offense Level of 50. Because the maximum Total Offense Level under the Guidelines is 43, the district court assigned Vázquez a Total Offense Level of 43. See id. ch. 5, pt.

---

[13] The district court relied on the November 1, 2012, Guidelines, the edition in effect on the date of sentencing. See United States v. Rodríguez, 630 F.3d 39, 42 (1st Cir. 2010). Citations in this opinion are to the 2012 Guidelines.

[14] The district court applied a two-level enhancement for committing the offense in a protected location, U.S.S.G. § 2D1.2(a)(1), a two-level enhancement for possession of a dangerous firearm in furtherance of a drug trafficking offense, id. § 2D1.1(b)(1), a two-level enhancement for directing the use of violence, id. § 2D1.1(b)(2), a two-level enhancement for maintaining a premises for the purpose of distributing a controlled substance, id. § 2D1.1(b)(12), and a four-level enhancement for being a leader of a drug trafficking organization with five or more participants, id. § 3B1.1(a).

A, cmt. n.2.  Based on a Criminal History Category of II, the district court calculated Vázquez's Guidelines Sentencing Range as life in prison.  After reviewing the 18 U.S.C. § 3553(a) sentencing factors, the district court sentenced Vázquez to concurrent sentences of life in prison for all six counts.

Neither party made any objections during the sentencing hearing.  Vázquez's defense counsel noted that Vázquez preached at the correctional facility and suggested only that the court recommend theology courses.  Vázquez personally did not make any arguments about his sentence.

The Base Offense Level for drug offenses depends mostly on the quantity of drugs involved in the offense.  U.S.S.G. § 2D1.1(c).  When fashioning a Guidelines recommended sentence for a drug conspiracy or possession offense, the district court must make a finding of drug quantity by a preponderance of the evidence.  United States v. Pizarro, 772 F.3d 284, 294 nn.13 & 14 (1st Cir. 2014).  This finding must be "an individualized finding as to drug amounts attributable to, or foreseeable by, that defendant."  United States v. Colón-Solís, 354 F.3d 101, 103 (1st Cir. 2004); see also United States v. Escobar-Figueroa, 454 F.3d 40, 51 n.3 (1st Cir. 2006) (applying Colón-Solís to Guidelines calculations).

Here, the district court did not make the required individualized drug quantity finding.  The bare recitation of the heroin and crack cocaine threshold quantities for a Base Offense

Level of 38 under U.S.S.G. § 2D1.1(c) does not qualify as such a finding. See Colón-Solís, 354 F.3d at 103-04. However, because Vázquez never lodged an objection at sentencing, we review his claim for plain error. United States v. Medina-Villegas, 700 F.3d 580, 583 (1st Cir. 2012). Although the district court's failure to make an individualized drug quantity finding was an error that was clear and obvious, Vázquez cannot make the requisite showing that this error affected his substantial rights or "seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id. (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)). In particular, for at least two reasons he cannot show that "but for the error, the district court would have imposed a different, more favorable sentence." Id. (internal quotation marks omitted).

First, because Vázquez did not object to the PSR, the district court could have relied on the PSR's recommended finding that Vázquez was responsible for at least 48 kilograms each of heroin and crack cocaine. See Fed. R. Crim. P. 32(i)(3)(A) ("At sentencing, the court . . . may accept any undisputed portion of the presentence report as a finding of fact."); United States v. Ocasio-Cancel, 727 F.3d 85, 92 (1st Cir. 2013) ("When a fact is set out in a presentence investigation report and is not the subject of a timely objection, the district court may treat the fact as true for sentencing purposes."); see also United States v. Medina, 167

-29-

F.3d 77, 81 (1st Cir. 1999) ("The unchallenged portions of the PSR provide us with an independent ground on which to justify our decision."). The PSR's unchallenged recommended quantity finding was more than adequate to meet the threshold of 30 kilograms of heroin or 8.4 kilograms of crack cocaine required for a Base Offense Level of 38. U.S.S.G. § 2D1.1(c).

Second, even relying only on the lesser quantities of drugs for which the jury found Vázquez responsible beyond a reasonable doubt, Vázquez still would have been subject to a Guidelines Sentencing Range that included life in prison. Vázquez does not challenge the twelve levels worth of enhancements the district court applied to determine his Total Offense Level. Therefore, a Base Offense Level of 31 or more would have resulted in the same maximum Total Offense Level of 43 and the same Guidelines Sentencing Range of life in prison. And indeed, considering only the four possession counts (Counts II-V) and leaving aside the conspiracy count (Count I), the jury found beyond a reasonable doubt that Vázquez possessed with intent to distribute enough of each drug that his Base Offense Level would have been 32 based only on the jury's findings. See U.S.S.G. § 2D1.1(c)(4). The verdict form completed by the jury asked, for Counts II through V, "[d]o you find beyond a reasonable doubt that the quantity of controlled substances that [Vázquez] possessed with the intent to distribute was" equal to or more than one kilogram of heroin, 50

grams of crack cocaine, five kilograms of cocaine, and 100 kilograms of marijuana. The jury checked "yes" in response to each question. One kilogram of heroin or five kilograms of cocaine alone would be sufficient for a Base Offense Level of 32. Id. Alternatively, grouping together the quantities found by the jury yields a total offense quantity equal to 2,278.55 kilograms of marijuana equivalents.[15] See id. §§ 3D1.2(d), 3D1.3(b) (grouping drug offenses); 2D1.1 cmts. 8(B), (D) (combining different controlled substances using marijuana equivalents). Because this amount is between 1,000 and 3,000 kilograms of marijuana, it too yields a Base Offense Level of 32. Id. § 2D1.1(c)(4).

A Base Offense Level of 32, with the unchallenged twelve levels of enhancement, would have resulted in a Total Offense Level of 44. The Total Offense Level must be reduced to the maximum of 43, id. ch. 5, pt. A, cmt. n.2, the same Total Offense Level that the district court used in sentencing Vázquez to life in prison. Therefore, the district court's clear and obvious error did not affect Vázquez's sentence, and does not require reversal on plain error review.

---

[15] One kilogram of heroin is equivalent to 1,000 kilograms of marijuana; 50 grams of crack cocaine is equivalent to 178.55 kilograms of marijuana; and five kilograms of cocaine is equivalent to 1,000 kilograms of marijuana. U.S.S.G. § 2D1.1 cmt. 8(D). The total grouped marijuana equivalents for Counts II to V is therefore 1,000 kilograms + 178.55 kilograms + 1,000 kilograms + 100 kilograms = 2,278.55 kilograms.

## 2. Life Sentence in Excess of Statutory Maximum on Count VI

In his opening brief, Vázquez mentions in passing that his life sentence for the firearm offense (Count VI) exceeded "the maximum penalty."[16]  He did not develop this point in any of his briefs or at oral argument.  Usually, we deem such a perfunctory challenge to waive a challenge to many types of claimed error.  Zannino, 895 F.2d at 17 ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").  Here, though, where the error that comes to our attention on direct review is a plainly unlawful and excessive sentence (albeit on one count only), we may set aside the error to prevent a miscarriage of justice.  See United States v. García-Ortiz, 528 F.3d 74, 85 (1st Cir. 2008) (deciding to address otherwise waived argument that life sentence on one count exceeded statutory maximum to prevent a miscarriage of justice, even though defendant was still subject to life sentence on another count).

---

[16] This passing reference reads in full, "[h]ere, where the defendant was issued a life sentence on counts one through six of the indictment, exceeding the maximum penalty for counts three, five, and six of the indictment, the failure to perform the required analysis of drug amount affected the defendant's substantive rights and the fairness, integrity or public reputation of the judicial proceedings."  His suggestion that the life sentences on the crack cocaine and marijuana possession charges (Counts III and V) exceeded the statutory maximum is without merit.  Vázquez faced a statutory maximum of life imprisonment on those two counts based on a prior felony drug conviction and the quantities of crack cocaine and marijuana (fifty grams and one hundred kilograms, respectively) that the jury found Vázquez possessed with intent to distribute.  See 21 U.S.C. § 841(b)(1)(B)(iii), (vii).

The error here is Vázquez's life sentence for the firearm offense, Count VI, which exceeds the applicable statutory maximum. 18 U.S.C. § 924(o) (a defendant convicted of conspiracy to possess a firearm in furtherance of a drug offense "shall be imprisoned for not more than 20 years"); see United States v. Almonte-Nuñez, 771 F.3d 84, 92 (1st Cir. 2014) ("Guideline calculations simply cannot usurp a maximum level of imprisonment established by Congress."). Section 924(o) does provide for a maximum life sentence "if the firearm is a machinegun or destructive device, or is equipped with a firearm silencer or muffler," but there was no such finding by the jury here.

As a practical matter, Vázquez's overall sentence of life in prison will not change even if we vacate his above-the-maximum sentence for the firearm possession offense, because the life sentences on his other five counts (Counts I-V) will remain. We recently observed that "[w]e have not adopted a uniform rule about whether, without a preserved claim of error, a defendant who is sentenced to a term of imprisonment in excess of a statutory maximum is entitled to relief even though his overall period of immurement will not be affected." Almonte-Nuñez, 771 F.3d at 92. Despite the lack of a uniform rule, we further noted that "[a]lthough particular cases may differ, flexibility exists and, under normal circumstances, our discretion should be exercised in favor of trimming back an excessive sentence." Id. In

Almonte-Nuñez, we decided to exercise this discretion in favor of modifying a 150-month sentence on one count that was in excess of the 120-month statutory maximum, even though the defendant still faced a concurrent 150-month sentence on another count. Id. Two factors influenced our decision. First, "leaving intact a sentence that exceeds a congressionally mandated limit may sully the public's perception of the fairness of the proceeding." Id. Second, we found it "unwise and unfair" to ask a defendant to bear the risk of "difficult to predict" "collateral consequences [that] may arise as a result of an above-the-maximum sentence imposed on a particular count." Id.

Here, Vázquez faces a smaller risk of harm from collateral consequences than the defendant in Almonte-Nuñez because, regardless of our decision, he must serve five concurrent life sentences on five other counts. But leaving in place the plainly unlawful sentence for Count VI could sully public perception of the proceeding. And, at least in theory, collateral review or other unpredictable events might alter someday the impact of the conviction on the other counts. We therefore remand to the district court with instructions to enter a modified sentence of twenty years in prison for the firearm offense (Count VI). See id. at 92-93.

**D. Ineffective Assistance of Counsel**

Vázquez's final challenge is that his trial counsel was constitutionally deficient for failing to object to leading questions on direct examination, inadmissible hearsay testimony, testimony about the murders, and the prosecutor's allegedly improper remarks during closing. See Strickland v. Washington, 466 U.S. 668 (1984). As a general rule, this court does not review ineffective assistance of counsel claims on direct appeal. United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991). There is an exception "where the critical facts are not genuinely in dispute and the record is sufficiently developed to allow reasoned consideration of an ineffective assistance claim," United States v. Reyes, 352 F.3d 511, 517 (1st Cir. 2003) (internal quotation marks omitted), but "why counsel acted as he did [is] information rarely developed in the existing record," and this information is crucial to resolve an ineffective assistance claim. United States v. Torres-Rosario, 447 F.3d 61, 64 (1st Cir. 2006). Because we can only speculate based on this record as to "why counsel acted as he did," id., we decline to review Vázquez's ineffective assistance of counsel claim on direct appeal.

## IV. Conclusion

For the foregoing reasons, we affirm Vázquez's convictions on all six counts. We also affirm his life sentences

on Counts I, II, III, IV, and V, but order the district court to enter a modified sentence of twenty years on Count VI.

So ordered.