# United States Court of Appeals
## For the First Circuit

No. 20-2187

UNITED STATES,

Appellee,

v.

EDWARD CANTY, III, a/k/a Demo,

Defendant, Appellant.

No. 21-1327

UNITED STATES,

Appellee,

v.

MELQUAN JORDAN, a/k/a Squirrel,

Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Jon D. Levy, U.S. District Judge]

Before

Lynch, Selya, and Kayatta,
Circuit Judges.

Luke Rosseel for appellant Edward Canty, III.
Julia Pamela Heit for appellant Melquan Jordan.
Benjamin M. Block, Assistant U.S. Attorney, with whom Darcie N. McElwee, U.S. Attorney, and Julia M. Lipez, Assistant U.S. Attorney, were on brief, for appellee.

June 23, 2022

**LYNCH**, **Circuit Judge**.  Edward Canty, III and Melquan Jordan distributed, from their individual independent supplies, heroin to users in Portland, Maine -- Canty for around four months in 2016 and Jordan from the summer of 2015 to early 2017.  They were prosecuted federally, not on distribution charges, but on charges that they had conspired with each other and several other individuals to distribute and possess with intent to distribute both heroin and cocaine base,[1] 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846.  Canty and Jordan maintain that they were independent drug dealers who did not conspire with one another.

At trial, the prosecutor made four types of improper comments at different points during the opening statement, at closing, and at rebuttal.  Each built upon the others and introduced improper themes.  The government has conceded that each of these comments was improper, though the defendants did not object at trial to the statements.  At the close of the government's case, the defendants moved under Rule 29 for judgments of acquittal on the basis of insufficiency of the evidence of conspiracy.  See Fed. R. Crim. P. 29(a).  The trial judge took the acquittal motions under advisement, eventually denying the motions after trial.  The jury returned a verdict of guilty against both Canty and Jordan.

---

[1]    Cocaine base is also known as crack cocaine, or crack.

- 3 -

Five months after the jury convictions, the defendants moved for a new trial based on the improper comments by the prosecutor.  Applying plain error review, the trial judge held that the first three prongs of the plain error standard were met.  He denied the motion, however, on the fourth prong, finding that there was no miscarriage of justice because the evidence of guilt was "overwhelming."  United States v. Jordan, No. 18-cr-00143, 2020 WL 5995585, at *15-16 (D. Me. Oct. 9, 2020).

Of the many issues raised by each of the two defendants in these consolidated appeals, we reach only the appeals of the motions for acquittal on the basis of insufficiency of the evidence and the denial of the motions for a new trial.  As to the insufficiency claim, we disagree with the defendants.  We also conclude that the district court's denial of the new trial motions was plain error and vacate and remand for proceedings consistent with this opinion.

**I.**

In March 2019, a superseding indictment issued against six individuals, including Canty, Jordan, Akeem Cruz, and Lamale Lawson, for conspiracy to distribute and to possess with intent to distribute controlled substances.  All defendants other than Canty and Jordan pleaded guilty.  A second superseding indictment then issued against Canty and Jordan for conspiracy to distribute and to possess with intent to distribute heroin and cocaine base, with

- 4 -

100 grams or more of a mixture or substance containing heroin involved in the conspiracy. The case proceeded to trial.

At trial, the government sought to prove that Canty and Jordan had conspired with each other and with others to sell heroin and crack cocaine from three separate locations, known as trap houses, in the Portland, Maine area between the summer of 2015 and February 2017. While Jordan was in the area for the entire period, Canty was only present for around four months in 2016. The government called eight witnesses in support of its case. One witness who the prosecution anticipated would testify, Lamale Lawson, exercised his Fifth Amendment right against self-incrimination and did not provide testimony.

In the summer of 2015, Jordan was in Portland, Maine and reconnected with old friends, siblings James Osborne and Jessica Tweedie, telling Osborne that he wanted to "see what was going on in the neighborhood," which Osborne took to mean he wanted to sell drugs there. At the time, Osborne was using heroin heavily and occasionally using crack cocaine. Osborne began recruiting customers for Jordan to sell heroin to, and in return Jordan gave Osborne heroin for his personal use.

Tweedie had a house in the Redbank housing complex at that time. Tweedie would sometimes give Jordan and Osborne rides to make drug sales, and sometimes would give Jordan rides to New York to resupply his drug stores. Jordan eventually began staying

at Redbank and had a sexual relationship with Tweedie. Tweedie used crack but testified that she did not get it from Jordan, and she did not use heroin from Jordan. Jordan would also package and sell drugs at Redbank.

Akeem Cruz, a friend of Jordan's from New York, started selling drugs at Redbank in 2016. Cruz stored his drugs at Redbank. He and Jordan would sell at the same time from their individual stashes, and they did not share customers. Lawson, who was friends with Jordan, also occasionally sold drugs at Redbank, though Tweedie told him not to.

In late 2015, Osborne needed heroin but Jordan was out of town, so Jordan sent him to Lawson, and Osborne got heroin from Lawson at an apartment on Sherman Street. Osborne continued to get drugs from Lawson, thereafter at an apartment located on Oak Street which was leased by a man named Lance Lombardi. Lombardi had previously allowed multiple drug dealers to deal out of this apartment, but eventually kicked them out. Osborne testified that after the previous dealers were kicked out, Lawson was "one of the dealers I brought in" to the Oak Street trap house. Osborne testified that Jordan and Lawson came in together to take over Oak Street and that he had been a part of a conversation with both of them about taking it over. He also testified that Lawson dealt from Oak Street first, then Jordan began dealing there as well a few months later, after Lawson told Osborne to go pick up Jordan

in Boston and bring him to Oak Street. Jordan and Lawson each paid Lombardi in drugs to allow them to use his apartment to deal from. Osborne recruited customers for Lawson and Jordan, and they gave him drugs in exchange. When Lawson and Jordan were both at the Oak Street apartment, they would take turns selling drugs to customers Osborne recruited, from their separate stashes. Osborne also answered the door to make sure that only people known to him could get into the apartment. Jordan was also selling from Redbank during this period.

Cruz did not deal from the Oak Street apartment, though on one occasion he gave Lombardi drugs to sell there on Cruz's behalf. Lombardi and Osborne, however, violated those instructions and used the drugs Cruz gave Lombardi instead of selling them.

In retaliation for this breach of instructions, Cruz and Canty -- who by this time had arrived in Maine -- assaulted Osborne at the Oak Street apartment; Canty held Osborne down while Cruz hit and kicked him. A juror could infer that Cruz had recruited Canty to assist him in the assault. Osborne testified that Lawson had told Cruz and Canty that they could find Osborne at Oak Street. After the assault, Canty began dealing drugs at Oak Street, around the same time Jordan began dealing there. Lombardi was eventually evicted from the apartment because of all of the foot traffic.

After Lombardi was evicted from Oak Street, Jordan began

selling heroin out of Amy Santiago's Grant Street apartment. Santiago was a customer with whom Jordan had a sexual relationship. Santiago would run drugs for Jordan and allowed him to sell from her apartment, and he gave her heroin in exchange. Lawson began coming to the Grant Street apartment behind Jordan's back; when Jordan found out Lawson had been there, he became angry. They argued several times about Lawson's presence in the apartment, and Santiago told Lawson to leave, but Lawson continued to come and sell drugs at Grant Street.

Osborne and Canty also went to Grant Street when Jordan was not there, and Canty told Santiago that he would give her heroin in exchange for her making drug runs. In all, Santiago testified that Canty came to Grant Street to sell heroin four or five times. Santiago also testified that she went to Redbank, and Tweedie told Santiago that she had heroin to sell from Canty. Tweedie, however, testified that she never sold any drugs for Canty, Cruz, or Lawson.

In late 2016, Canty began selling heroin at Redbank, where Jordan had already been selling drugs. Canty and Jordan used both the Redbank and Grant Street apartments during the same time period. Osborne testified that during the time that Canty was in Maine, Canty, Cruz, and Jordan all slept at Redbank. Tweedie, however, testified that Canty was not staying at Redbank and that Jordan slept there occasionally but stayed at Grant

Street.  For her part, Santiago testified that Lawson, Canty, and Jordan stayed at Redbank.

A customer named Tanya Johnson testified at trial that she had come from South Carolina to Maine in September 2016.  A friend of hers named Alicia took her to Grant Street to get heroin.[2] When Johnson went to Grant Street at first, she would wait outside and Osborne would bring what was supposed to be heroin to her, which Johnson said was "sheetrock," i.e., not heroin or very low-quality heroin.  After this occurred a few times, Johnson got Jordan's phone number and began purchasing heroin from him inside Grant Street.  At Grant Street, Johnson would buy either from Jordan or from the woman who lived there whose name she did not know, presumably Santiago.  Johnson began giving Jordan rides around Portland, sometimes to drug transactions, in exchange for heroin.  On one occasion, someone called Johnson from Jordan's phone number and asked her to give someone a ride from Grant Street.  When she pulled up, Canty[3] came out, and she gave him a ride to Redbank in exchange for heroin.  Johnson then began buying

[2]     Johnson later suggested that Alicia had procured the drugs and had told her that she had gotten them from Grant Street, rather than taking her there.

[3]     Johnson referred to Canty as "Debo," unlike the other witnesses, who called him "Demo."

- 9 -

heroin from Tweedie[4] at Redbank. Johnson testified that Tweedie indicated that Canty was her supplier, and on one occasion she purchased heroin from Tweedie in Canty's presence.

In December 2016, Johnson was pulled over and law enforcement found heroin residue in a bag on the floorboard of her vehicle. She agreed to become a confidential informant and to perform controlled drug buys. Johnson testified that she did three controlled buys: first, she called Jordan and met him at Grant Street and bought heroin from him; second, she called Jordan again and he sent someone else whom Johnson did not know, and the substance they delivered was not heroin; and third, she called Tweedie and got heroin from her at Redbank, where they were alone in the house. Johnson testified that she did not call Canty to make a controlled buy. Earlier in the same line of questioning, however, Johnson had testified "I think the first transaction was with [Jordan] and the second was with [Canty]."

Johnson's testimony about the controlled buys conflicted directly on several points with the testimony of Jonathan Stearns, a South Portland Police Detective assigned to the Maine Drug Enforcement Agency. Stearns testified that Johnson had made four, not three, controlled purchases, and none of them were from Jordan.

---

[4] Johnson did not know Tweedie's name, but identified the woman she was referring to from a photo of Tweedie.

- 10 -

He testified that he was surprised to learn Johnson had testified that she had made controlled buys involving Jordan. The four buys that Stearns described were: Johnson met with Tweedie on December 19, 2016 on Valley Street to purchase heroin, though Tweedie actually gave her gabapentin; Johnson purchased heroin on December 20 from Tweedie in a restaurant parking lot; on December 22, Johnson made a controlled purchase of heroin from Tweedie at Redbank; and on December 22, Johnson called Canty's number to arrange a purchase and was instructed to go to a location where she met with Santiago, who gave her heroin. Recall Johnson had testified that she did not call Canty for any of the controlled buys.

On December 22, 2016, Maine Drug Enforcement Agency agents raided Redbank, seizing heroin and crack cocaine and arresting Tweedie. Tweedie testified that she had not placed drugs in the bedroom where law enforcement found them. She testified that earlier that day Canty had been at the house carrying a black plastic bag, and he had told her he was "grabbing his stuff to leave" and asked to use the bathroom, which was upstairs. FBI Special Agent Patrick Clancy, who was doing surveillance that day at Redbank, testified that he saw Canty entering and exiting Redbank with a paper bag.

Osborne, Santiago, and Canty were at Grant Street when Tweedie's sister called to say that Tweedie had been arrested.

- 11 -

Canty gave Santiago money, crack, and heroin that he had on his person, and Osborne took Canty to an apartment on Sherman Street. Canty left town.

After Canty left Maine, Jordan and Lawson continued to sell heroin at Grant Street following the raid at Redbank. Some time after the raid at Redbank, a Facebook video was taken that showed Osborne, Jordan, and Lawson at Grant Street. In the video, which the government showed to the jury, Jordan is seen assisting Osborne in putting a tourniquet on his arm, and Osborne appears to be already under the influence of heroin. Osborne testified at trial that the tourniquet was "[s]o we [could] get a vein" to inject heroin. Canty was not present in the video. The government stipulated that the video took place after Canty had left Maine and was no longer part of the alleged conspiracy, and the court instructed the jury to consider the video evidence only in connection with the government's case against Jordan, not Canty. Law enforcement raided Grant Street in early 2017, at which point Jordan and Lawson stopped selling heroin in Maine.

At the close of the government's case, Jordan and Canty both made motions for judgment of acquittal under Rule 29, arguing that the government had failed to prove a conspiracy existed. The court took the motions under advisement and ordered briefing on them. The prosecutor made a number of improper arguments in her opening, closing, and rebuttal arguments, which we detail in

section II, infra, and neither of the defendants objected to them.

After deliberating for about four hours, the jury rendered its verdict on October 24, 2019, finding Jordan and Canty guilty of conspiracy to distribute and to possess with intent to distribute cocaine base and heroin. The jury found only Jordan was guilty of conduct that involved 100 or more grams of a mixture or substance containing a detectable amount of heroin.

On February 14, 2020, several months after the trial was over, the district court heard argument on the defendants' motions for acquittal. The judge stated that the issues presented by the motions for acquittal were "particularly difficult and close." The "crux of the issue," he explained, was whether the government had proved the single conspiracy alleged in the indictment as opposed to multiple conspiracies, or no conspiracy at all. The standard of review the district court applied was "whether any rational factfinder could have found that the evidence presented at trial, together with all reasonable inferences viewed in the light most favorable to the [g]overnment," established the elements of a conspiracy beyond a reasonable doubt.

The district court found that the first element of a single overarching conspiracy, a common purpose, was satisfied because a reasonable juror could conclude that the defendants had a common purpose in maintaining shared locations (albeit they were apartments rented by others) to allow for the maintenance of a

steady stream of customers and to keep a "relatively safe place to sell drugs where their detection was minimized." The trial judge likened the dealers to keepers of stalls at a flea market, selling separate goods at a shared location for everyone's mutual benefit. The second element, interdependence, the trial judge called a "close call," but he ultimately ruled that it was met because the dealers relied on one another for their shared trap houses to function. He concluded that the final element, overlap, was met because each dealer relied on Osborne to some degree to act as a recruiter, and Tweedie and Johnson as drivers. In all, the district court concluded, there was sufficient evidence under the Rule 29(a) standard for a juror to conclude that there was a meeting of the minds regarding a shared objective. The district court denied the motions for acquittal.

## II.

The defendants appeal the district court's denial of their motions for acquittal. For purposes of reviewing the district court's denial of the defendants' motions for acquittal, we view the evidence in the light most favorable to the verdict. See United States v. Merlino, 592 F.3d 22, 29 (1st Cir. 2010). For substantially the reasons explained in section III, infra, we find that there was sufficient evidence of a conspiracy for a jury to convict the defendants (although we find that, due to the prosecutor's improper statements, a new trial is warranted). These

claims therefore fail. Because we reverse the district court's denial of the defendants' motions for a new trial, we need not address the defendants' various claims as to other errors at trial.

For purposes of reviewing the denial of the new trial motion based on prosecutorial misconduct, we take a balanced view of the evidence. See United States v. Rodríguez-De Jesús, 202 F.3d 482, 485 (1st Cir. 2000). At trial, the prosecution made a number of improper arguments and comments, which led to a post-trial motion for a new trial. Though the defendants had not contemporaneously objected at trial, in March 2020, Canty filed a motion for a new trial, which Jordan joined. See Fed. R. Crim. P. 33(a). They argued that they had been prejudiced by these improper statements and that they met all four prongs of plain error review. On October 9, 2020, the district court ruled on the defendants' motion for a new trial.

Conducting plain error review, the district court found that the prosecutor engaged in four improper arguments. It thus found that there was error, the error was clear, and the error prejudiced the defendants' substantial rights, so the first three prongs of plain error review were satisfied. However, the district court held that the fourth prong of plain error review -- whether the errors seriously impaired the fairness, integrity, or public reputation of judicial proceedings -- was not met. The district court stated that the evidence against Jordan of an overarching

- 15 -

conspiracy was "overwhelming," and the evidence against Canty was "ample," so there was "little doubt that the jury would have convicted the Defendants" without the improper statements. Jordan, 2020 WL 5995585, at *15-16.

We set forth and consider the prosecutor's improper statements.

1. Appeals to jury's emotions as conscience of the community

The prosecutor from the very start cast Canty and Jordan as cruel and greedy outsiders who came to Maine to distribute illegal drugs to suffering Mainers. She began her opening statement to the jury by asserting that the defendants were not members of the Maine community. Rather, the prosecutor told the jury, the defendants were greedy New Yorkers who "came here" to Maine to "make easy money" off the backs of Mainers struggling with addiction. She said:

> As long as greed is stronger than compassion, there will always be suffering. This case, ladies and gentlemen, is about the greed of a group of young men from the area of Brooklyn, New York, who came here to make easy money selling illegal drugs and the suffering of many Mainers whose addictions helped make those men money.

The prosecutor later drove home these points at the start of her closing statement, reiterating that the defendants had come to Maine from Brooklyn, New York in order to "exploit individuals who are addicted to drugs that cause suffering, suffering inside

- 16 -

their bodies." She referred to the testimony of the government's witnesses about the effects of the drugs and "what suffering can come from those drugs if they don't continue to use them," emphasizing again to the jury "the suffering of drug-addicted individuals . . . in the greater Portland area."

The prosecutor took up the themes of exploitation and of causing suffering once more in the rebuttal. There, she added descriptions of what the defendants' go-betweens would go through physically if they did not get drugs:

> I suggest to you that this is ingenious model for drug trafficking . . . . You find someone who needs [heroin] because they will get physically sick. They will vomit; they will have diarrhea; they will get headaches; they will be physically miserable if they don't get that needle in their arm or they don't smoke that pipe.

Indeed, the prosecutor stated that the "common thread" through the government's witnesses was "that they were exploited by these two defendants . . . to take the very thing that made them so vulnerable and take advantage and make money[.]"

"[I]t is improper to appeal to the 'jury's emotions and role as the conscience of the community.'" United States v. Avilés-Colón, 536 F.3d 1, 24 (1st Cir. 2008) (quoting United States v. Martínez-Medina, 279 F.3d 105, 119 (1st Cir. 2002)). It is also improper to stress harm to a particular community caused by drug dealing. United States v. Machor, 879 F.2d 945, 956 (1st

- 17 -

Cir. 1989) (finding improper prosecutor's statement that "[drugs] are poisoning our community and our kids die because of this" (alteration in original)). As the trial judge found, this set of comments by the prosecutor was highly improper:

> Here, the prosecutor's statements went beyond the Defendants' profit motive by ascribing a callousness to them based on, as the prosecutor argued, "the suffering of many Mainers whose addictions helped make those men money." The prosecutor's emphasis on the impact of drugs on "Maine," "many Mainers," and "the greater Portland area" improperly called on the jury to consider the impact of drugs on their community.

Jordan, 2020 WL 5995585, at *9 (citations omitted).

2. Arguments for conviction on the basis that coconspirators were serving jail time

After defense counsel argued at closing that the government's witnesses were unreliable for several reasons, including because they testified in exchange for immunity, the prosecutor argued on rebuttal:

> [Three of the trap houses in the case] had renters in them whose places were taken over by these defendants and their [co]conspirators. The people who had those renting agreements did participate in this conspiracy, we allege. And they all went to jail. So we're here now to say it's [the defendants'] turn.
>
> [The alleged coconspirators] went to jail. They didn't get a pass. They got immunity in this chair from their statements being used against them in the event the federal government decided to charge them, too. But they stood in that courthouse and they pled

- 18 -

> guilty and they went to jail. Jaden Brown went to jail for 15 months. Jessica Tweedie went to jail for seven months. And Amy Santiago went to jail for seven to nine months . . . . They didn't get a pass. Jessica Tweedie was in jail while this guy . . . Mr. Jordan, was trapping in Ms. Santiago's house, because they talked on the phone while Ms. Santiago and Mr. Osborne told you he was bagging up drugs at 11 Grant Street and welcoming customers all day long, while Jessica Tweedie is sitting in jail, we argue for Mr. Canty's drugs. None of those three women got a pass. They got protection for their statements being used against them here.

The prosecutor thus managed to convey at least the following: (1) it was the defendants' "turn" to go to jail because other coconspirators, including those who were addicted and had purchased the heroin, had gone to jail; (2) these other coconspirators who had gone to jail were mere renters of the apartments while defendants, specifically Jordan, were using the apartments as trap houses to package and sell drugs; and (3) Jessica Tweedie, a drug user, was sitting in jail for Canty's crimes.

The trial judge correctly found the prosecutor's statements constituted an improper guilt-by-association argument. While the government has some latitude in responding to arguments made by defense counsel, see United States v. Foley, 783 F.3d 7, 22 (1st Cir. 2015), this rebuttal went beyond a fair response to defense arguments. "A defendant is entitled to have the question of his guilt determined by the evidence against him, not on whether

- 19 -

a co-defendant or government witness has been convicted of the same charge." United States v. Vázquez-Rivera, 407 F.3d 476, 484 (1st Cir. 2005) (quoting United States v. Dworken, 855 F.2d 12, 30 (1st Cir. 1988)); see also United States v. Landrón-Class, 696 F.3d 62, 71 (1st Cir. 2012) (finding improper an argument that "suggest[ed] to the jury that, just as those individuals were held responsible, now it is [defendant]'s turn"). The prosecutor's argument also suggested to the jury that it was unfair that the victims of the drug dealing, the addicts, had been jailed, while their dealers were not. Further, the prosecutor argued that Jessica Tweedie was in prison for Canty's crimes. As the trial judge stated, the argument "improperly suggested to the jurors that it was their duty to not only determine the Defendant[s'] guilt or innocence, but to also determine whether the Defendants should go to jail." Jordan, 2020 WL 5995585, at *5. We agree with the trial court's characterization.

3.  Vouching

The prosecutor made further improper statements on rebuttal. The defense at closing had argued that, although the indictment charged a conspiracy to distribute both cocaine base and heroin by these defendants, the prosecution had made no effort to introduce any evidence of cocaine base conspiracy by either defendant. Canty's attorney also argued in closing that evidence

collected by the police "didn't add a thing."  The prosecutor then

argued in rebuttal:

> And it depends on which drug we're talking about.
>
> And I do want to address that really quickly, and I'll try to stay on topic here.  But our job we take very seriously.  It is to prove to you that there was a conspiracy.  The conspiracy that these very hard-working agents after three years found existed involved crack cocaine and heroin.  Some of the people involved in the conspiracy only dealt with heroin.  They're sitting here before you.  Some of them dealt with crack cocaine.  And some of the people on this witness list who were conspirators or just addicts who came before you were going to talk about crack cocaine.  The conspiracy involved both drugs. . . .  But they don't both -- they don't have to have dealt with both drugs for you to find them guilty.  You have to find that they joined a conspiracy . . . .
>
> And with all due respect to [defense counsel], these agents did three years of work, and it is evident in the exhibits that you saw.  Those grand jury transcripts they waved around were hundreds of pages long.  We didn't just throw people up there that we met. . . .
>
> So we spent three years carefully talking to those people.  So to say there's been no law enforcement work is unfair, because this case has revealed that these agents spent time with people.  They showed compassion for people who had problems, they spent time with them, and they made sure that there was corroborative evidence for their stories.

These arguments, the district court held, went beyond permissible

rebuttal and were improper vouching for the credibility of the

prosecuting agents and their witnesses. Jordan, 2020 WL 5995585, at *7. We agree.

"A prosecutor improperly vouches for a witness when she places the prestige of her office behind the government's case by, say, imparting her personal belief in a witness's veracity or implying that the jury should credit the prosecution's evidence simply because the government can be trusted." Avilés-Colón, 536 F.3d at 25 (quoting United States v. Perez-Ruiz, 353 F.3d 1, 9 (1st Cir. 2003)). It "plainly cross[es] over into improper vouching . . . when the prosecutor tells the jury that the prosecutor takes personal responsibility or ownership of the case and thus directly places the government's credibility at issue." United States v. Vázquez-Larrauri, 778 F.3d 276, 284 (1st Cir. 2015).

Here, the prosecutor used "we" in describing what work had been done to make this case. She emphasized that law enforcement had put in three years of hard and serious work on the case. She told the jury that "we spent three years carefully talking to those people," that they "spent time with them," and that law enforcement "made sure there was corroborative evidence for their stories." She assured the jurors that "[w]e didn't just throw people up there [on the witness stand] that we met." She told the jury that law enforcement "showed compassion for people who had problems." In total, these arguments conveyed to the

- 22 -

jurors that the government witnesses in the case could be trusted because of the hard work the police and the prosecution had put into selecting and vetting them during the investigation. These statements improperly "place[d] the government's credibility at issue" by tying the witnesses' credibility to the hard work and compassionate character of the police and prosecution. Vázquez-Larrauri, 778 F.3d at 284. That the prosecutor was responding to arguments by the defense does not rescue this line of argument, because her statements went well beyond contentions by the defense that the government had not provided any evidence of the defendants dealing cocaine base and that the police's evidence did not add anything.

4.  Improper argument from video

The prosecutor's final improper argument was improper as to Canty. When commenting on the video showing Jordan helping Osborne apply a tourniquet to his arm, the prosecutor mischaracterized this piece of evidence. At the end of rebuttal, referring to both defendants, she stated "they'd help you put a tourniquet on your arm if it meant that you were going to get what you needed so that you could go back out and make another deal." It is improper for the prosecution to make a statement "unsupported by any evidence." United States v. Azubike, 504 F.3d 30, 38 (1st Cir. 2007). As the trial court found, this statement by the prosecutor was not only unsupported by the evidence as to Canty,

- 23 -

but also undermined the court's instruction to the jury to only consider the video evidence as to Jordan and was therefore improper. See Jordan, 2020 WL 5995585, at *10.

## III.

Our review of the denial of the motions for new trial is for plain error because defense counsel did not contemporaneously object to any of the prosecutor's comments. Vázquez-Larrauri, 778 F.3d at 282-83. To show plain error, defendants must demonstrate "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Solís-Vásquez, 10 F.4th 59, 64 (1st Cir. 2021) (quoting United States v. Mercado, 777 F.3d 532, 536 (1st Cir. 2015)), cert. denied, 142 S. Ct. 833 (2022); see also Fed. R. Crim. P. 52(b).

In ruling on the new trial motion, the district court correctly articulated the four-prong plain error standard. See United States v. Brandao, 448 F. Supp. 2d 311, 318 (D. Mass. 2006) ("[I]t is not unprecedented for a trial court to apply the plain error standard to an objection raised for the first time in a post-trial motion, because at that stage, the court 'performs something of an appellate role.'" (quoting United States v. Washington, 263 F. Supp. 2d 413, 426 n.7 (D. Conn. 2003))), aff'd, 539 F.3d 44

(1st Cir. 2008).  It is efficient for district courts to correct their own plain errors if necessary.

The district court, however, made two errors in assessing the defendants' motions for a new trial on plain error review.  The first was in making inconsistent holdings that the defendants were prejudiced by the improper statements on the third prong of plain error review but that the strength of the evidence overcame the effect of the misconduct on the fourth prong of plain error review.  The second error was its assessment that the evidence the prosecution put forth of a single overarching conspiracy was sufficiently strong to dispel concerns that the prosecutor's improper arguments affected the convictions.  We take these errors in turn.

1.  Inconsistency in the district court's findings as to the third and fourth prongs of plain error review

On the third prong of plain error review, the district court concluded that the defendants were prejudiced by the improper comments, but, on the fourth prong, the district court found that the prosecution's evidence was so strong that the improper comments did not affect the outcome of the trial.  Jordan, 2020 WL 5995585, at *13, *16.  These holdings cannot be reconciled.  To understand why they are inconsistent, it is necessary to first examine the standards for the third and fourth prongs of plain error review,

- 25 -

as well as the factors we consider in determining whether prosecutorial misconduct requires a new trial.

The third prong of plain error review, that an error affects a defendant's substantial rights, generally requires the defendant to "show a reasonable probability that, but for the error, the outcome of the proceeding would have been different." Rosales-Mireles v. United States, 138 S. Ct. 1897, 1904-05 (2018) (internal quotation marks omitted) (quoting Molina-Martinez v. United States, 578 U.S. 189, 194 (2016)). The district court found that the prosecutor's remarks affected the defendants' substantial rights, and the government does not defend on appeal on the basis that the trial judge erred in finding that the third prong of plain error had been met. As we outline in the next section, we agree with the district court that the defendants' substantial rights were affected by the prosecutor's comments because there is a reasonable probability that the outcome of the trial would have been different but for the comments.

Once the first three requirements of plain error have been met, the Supreme Court has described the fourth prong as going to the exercise of the appellate court's discretion. See Rosales-Mireles, 138 S. Ct. at 1905. And though Rule 52(b) is permissive, courts "should" correct plain errors affecting substantial rights "if the error seriously affects the fairness, integrity[,] or

public reputation of judicial proceedings." Id. at 1906 (internal quotations and citations omitted).

Whether or not the argument has been preserved, our cases reviewing a denial of a motion for a new trial on the basis of prosecutorial misconduct have considered the following non-exclusive factors: "(1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant[ ]." Vázquez-Larrauri, 778 F.3d at 283 (alteration in original) (quoting United States v. Kasenge, 660 F.3d 537, 542 (1st Cir. 2011)). These factors are considered to determine "whether the prosecutor's misconduct so poisoned the well that the trial's outcome was likely affected, thus warranting a new trial." Azubike, 504 F.3d at 39 (internal quotation marks omitted) (quoting United States v. Joyner, 191 F.3d 47, 54 (1st Cir. 1999)).

When reviewing a new trial motion based on prosecutorial misconduct, the third prong of plain error review and the test for whether prosecutorial misconduct warrants a new trial both ask whether it is likely that the misconduct affected the trial's outcome. The district court found that the defendants had satisfied the third prong of plain error review by demonstrating that the improper comments had prejudiced them, but then determined

on the fourth prong of plain error review that the strength of the evidence was sufficient to overcome the misconduct.  This was an error of law.  The district court should have analyzed the effects of the prosecution's comments only at the third step of plain error review, rather than analyzing prejudice twice, at both the third and fourth prongs of plain error review -- with inconsistent results.  Because the district court made these irreconcilable findings, one must be incorrect.

2.  The effect of the prosecution's improper comments

We next assess the prosecution's comments under the third prong of plain error review.  We conclude that the district court was correct as to its ruling on the third prong of plain error review, that the prosecutor's comments prejudiced the defendants, but, contrary to the district court, we also conclude that (applying the proper standard) the defendants meet the fourth prong of plain error review.  In making our determination as to the third prong, we consider whether the defendants' substantial rights were prejudiced, guided by the factors outlined above as to whether prosecutorial misconduct warrants a new trial: severity, context, curative instructions by the district court, and the strength of the prosecution's evidence.  See Vázquez-Larrauri, 778 F.3d at 283.

a.    Severity

As to the first factor, the impropriety of the comments, taken as a whole, was severe.  None of these comments, standing in isolation, was sufficiently reprehensible to warrant a new trial, but their cumulative effect was, for reasons we explain.  On this record, we cannot say that the improper statements were accidental. See Arrieta-Agressot v. United States, 3 F.3d 525, 530 (1st Cir. 1993) ("Almost any argument made in summation can be described as deliberate[.]").  The prosecution began with improper themes in the opening statement, built upon and exacerbated them at closing, and then repeated and added to them in the rebuttal.  Further, as the government appellate lawyer, to his credit, conceded at oral argument, this was a very experienced prosecutor.[5]  It is possible that the government's case was not as strong as it anticipated it would be because Lawson, a major player in the case, decided not to testify at the last minute, so the prosecution may have felt the need to compensate with appeals to the jury's emotions.

---

[5]    We take judicial notice of the prosecutor's experience. Press Release, Dep't of Justice (Oct. 8, 2021) (noting that the prosecutor became an Assistant United States Attorney in 2002).  A court of appeals "may take judicial notice of facts which are 'capable of being determined by an assuredly accurate source.'" Pietrangelo v. Sununu, 15 F.4th 103, 106 n.1 (1st Cir. 2021) (quoting United States v. Hoyts Cinemas Corp., 380 F.3d 558, 570 (1st Cir. 2004)); see also Fed. R. Evid. 201(b)(2).

b.    Context

As to the context, there were four improper arguments spanning from the opening, through the closing, and in the rebuttal.  See Azubike, 504 F.3d at 39 ("[P]rejudicial statements made during closing argument 'militate in favor of reversal' because they are 'the last words spoken to the jury by the trial attorneys.'" (quoting United States v. Manning, 23 F.3d 570, 575 (1st Cir. 1994))); see also United States v. Torres-Colón, 790 F.3d 26, 34 (1st Cir. 2015) ("We view problematic statements during rebuttal with particular scrutiny, because the government's rebuttal argument offers the last word before the jury begins deliberations.").  The comments were not isolated.  Cf. United States v. Cruz-Rivera, 14 F.4th 32, 54 (1st Cir. 2021) (finding reversal of conviction unwarranted where the prosecutor's "one arguable misstatement was isolated"), petition for cert. docketed, No. 21-7638 (U.S. Apr. 18, 2022).  The improper vouching and suggestion to the jury that it was the defendants' turn to go to jail were not stray comments, but arguments built over a considerable portion of her rebuttal.  The emotional appeal to the jury to be other than finders of fact as to guilt was extensive, and was repeated at opening, closing, and at rebuttal.

c.    Curative instructions

As to the curative instructions, because of defense counsels' failure to object, there were no curative instructions

- 30 -

directly on point. The government argues that the district court's instructions were nevertheless sufficient to negate the impact of improper argumentation. It first argues that the court's generalized instructions -- instructing the jury not to be influenced by prejudice, to decide the case solely on the evidence, and that counsel's arguments are not evidence -- are sufficient. "We have at times found the district court's standard instruction, advising jurors that arguments of counsel are not evidence, adequate to dispel any prejudice from improper remarks." United States v. Ayala-García, 574 F.3d 5, 21 (1st Cir. 2009). However, where the improper remarks are particularly severe or pervasive, and go to issues central to the case, general instructions may not be sufficient to neutralize them. See id. at 21-22 (finding curative instructions which did not explicitly call for the jury to disregard improper statements insufficient to overcome the misconduct at issue). Here, the district court's standard, general instructions did not overcome the effect of the prosecutor's improper statements. The trial judge cited Azubike for the proposition that such standard instructions "may well be insufficient." Jordan, 2020 WL 5995585, at *14 (quoting Azubike, 504 F.3d at 41). We agree.

Second, the government argues that the prosecutor's improper attribution of the video to both defendants was cured because the district court instructed, when the video was shown,

that it should only be considered as to Jordan, and because the district court reiterated in its final instructions that evidence received for a limited purpose can only be considered for that purpose. This argument would carry more weight if the statement were merely an isolated comment, but it was not; the prosecutor's comment that "they'd help you put a tourniquet on your arm" was part of a larger theme throughout that the defendants were callous and cruel. The prosecution attributed to Canty actions from a video that depicted Jordan enabling Osborne's drug use by assisting Osborne, clearly already under the influence of drugs, in putting on a tourniquet in preparation to inject heroin. As is often said, a picture is worth a thousand words. The prosecutor's association of Canty with the actions in the video was not cured by instructions that did not specifically address the improper statement.

d. Strength of the evidence against the defendants

The trial court at different times gave different evaluations of the strength of the government's evidence. We think it is most significant that the trial court said the issue was "particularly difficult and close" when considering the defendants' motions for acquittal. The trial court's different evaluation when it ruled on the new trial motions nearly a year

- 32 -

after the jury verdict was rendered does not have the same importance as its earlier assessment.

A criminal conspiracy exists where there is an "agreement between two or more persons to accomplish an unlawful purpose." United States v. Dellosantos, 649 F.3d 109, 115 (1st Cir. 2011). "The agreement is the sine qua non of a conspiracy, and this 'element is not supplied by mere knowledge of an illegal activity . . . , let alone by mere association with other conspirators or mere presence at the scene of the conspiratorial deeds.'" Id. (alteration in original) (quoting United States v. Zafiro, 945 F.2d 881, 888 (7th Cir. 1991)). The defendants contend that the government's evidence did not establish the single overarching conspiracy that was charged in the indictment, but rather shows that Jordan and Canty had individual agreements with various actors at different times. In determining whether a single conspiracy exists, we look to three factors: "(1) the existence of a common goal, (2) interdependence among participants, and (3) overlap among the participants." Id. at 117 (quoting United States v. Mangual-Santiago, 562 F.3d 411, 421 (1st Cir. 2009)).

i. Common goal

"The common goal factor is given 'wide breadth.'" Mangual-Santiago, 562 F.3d at 421 (quoting United States v. Sanchez-Badillo, 540 F.3d 24, 29 (1st Cir. 2008)). A goal of selling drugs or furthering the distribution of drugs is sufficient

- 33 -

to satisfy it.  Id.  Canty and Jordan do not contest that the evidence is sufficient to establish a common purpose.  They challenge the evidence, however, as to interdependence and overlap.

ii. Interdependence

"Interdependence exists where 'the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme.'"  United States v. Rivera Calderón, 578 F.3d 78, 89 (1st Cir. 2009) (quoting Mangual–Santiago, 562 F.3d at 422).  Here, the evidence showed that Canty and Jordan had separate suppliers, made trips to New York independently to resupply, and made sales individually from the same locations.  The government emphasizes that the evidence showed that Lawson, Jordan, Canty, and Cruz "operated cooperatively from multiple trap houses in Portland and shared employees."  While the evidence could support a finding that Cruz, Canty, Jordan, and Lawson all benefitted from selling from the same trap houses because customers had a place they could reliably come for drugs, the evidence adduced by the government lacks much of what we have previously considered demonstrative of interdependence.

The government argues that this case is like United States v. Negrón-Sostre, 790 F.3d 295 (1st Cir. 2015).  We disagree.  In that case, we found the elements for a conspiracy

- 34 -

were met by evidence that the defendants had created a drug "supermarket" of sorts. Id. at 310-11. It was described as:

> a highly-organized operation that ran 24/7 and provided seemingly all of the illicit substances its clientele might desire. Lookouts, much like store security, served to protect all owners from losses -- not from shoplifters, but from law enforcement. Runners supplied multiple sellers, and sellers simultaneously sold brands from several owners, much like warehouse operators and sales clerks. All of these workers were organized in strict twelve-hour shifts . . . . Not only did the owners cooperate by allowing their runners and sellers to work for different owners at the same time, but when necessary, they met to resolve a dispute that might have threatened the profitability of the enterprise.

Id. at 312. That is not this case. Here, there was no evidence of set shifts, meetings, or rules of any kind that would evince any agreement. While all of the dealers used Osborne to either run drugs or recruit customers, they did not hire him jointly, and each dealt with him on his own terms -- while Jordan did not mind much when Osborne used the heroin he was supposed to sell, and would give him heroin even when he did not recruit any customers, Cruz got Canty to help him beat-up Osborne for using heroin that was supposed to be sold.

The dealers did not share the same supplier and resupplied separately in different ways: Canty drove his own car to New York, while Jordan, who did not drive, would get a ride with someone or take the bus, sometimes recruiting women to smuggle

the drugs to Maine in a body cavity. They sold from individual supplies, and Tanya Johnson testified that she preferred to buy from Jordan or Canty rather than Lawson, because she thought Lawson's product was inferior. There was no evidence that the defendants met to set prices in order to maximize profits and to discuss threats to their enterprise, that they used force to keep other dealers away from the trap houses where they sold, that they stored weapons together for security purposes, or that they had a shared set of rules, all of which we have previously found to demonstrate interdependence. See Rivera Calderón, 578 F.3d at 90; see also United States v. Soto-Beníquez, 356 F.3d 1, 19-20 (1st Cir. 2003).

There was evidence that the dealers sometimes sold from the various trap houses at the same time, such as when Lawson and Jordan took turns selling to customers at Oak Street. There was also the testimony from Osborne that Lawson and Jordan had discussed taking over Oak Street, although he also testified that they began selling there months apart. Lawson, Cruz, Canty, and Jordan all sold drugs at Redbank, though there was no evidence that Cruz dealt drugs at either Grant Street or Oak Street (there was evidence that on one occasion Cruz gave Lombardi drugs to distribute at Oak Street). However, there was evidence that Jordan was displeased when he found out that Lawson was dealing at Grant Street and argued with him to leave. Even if we interpret the

- 36 -

fact that Lawson did not leave as the government asks us to, as a tacit acquiescence by Jordan to Lawson's presence at Grant Street, it is poor evidence of a grand overarching conspiracy spanning multiple trap houses for the same dealers apparently to happily deal simultaneously at one location but only grudgingly at another. Moreover, the evidence shows that at least the first time Canty came to Grant Street, it was when Jordan was not present.

In United States v. Pressler, the Third Circuit found that there was not sufficient evidence of a conspiracy where two people lived together for several months, sold drugs from their shared residence daily, and one would supply customers when the other was unavailable to do so. 256 F.3d 144, 155 (3d Cir. 2001). The present case is closer to Pressler than it is to Negrón-Sostre: there is evidence that the defendants knew one another, they lived together for a time, and they sometimes supplied the same customers. But there is not the tight organizational structure, the rigidly enforced code of conduct, or the pooling of resources to the advantage of the entire group that we have found to be indicative of interdependence in other cases. See Negrón-Sostre, 790 F.3d 309-10; Rivera Calderón, 578 F.3d at 89-90.

### iii. Overlap

Overlap can be achieved by "the pervasive involvement of a single 'core conspirator'" or "hub character." United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999) (quoting United States

- 37 -

v. <u>Wilson</u>, 116 F.3d 1066, 1076 (5th Cir. 1997), <u>vacated on other grounds by</u> <u>United States</u> v. <u>Brown</u>, 123 F.3d 213 (5th Cir. 1997)). It can also be demonstrated where "runners and sellers work[] for multiple owners, and lookouts work[] for the benefit of all," and where such "workers" work in a "highly-organized" "shift system" coordinated by meetings between the owners. <u>Negrón-Sostre</u>, 790 F.3d at 310, 312.

The government asserts that there is ample evidence of overlap, pointing to Osborne's role as a lookout at Oak Street, and his work recruiting customers and running drugs for the dealers. The government also points out that Tweedie allowed all of the dealers to sell drugs at her apartment and would give Jordan and Canty rides between trap houses, and that Santiago delivered drugs for Jordan, Canty, and Lawson, and allowed them to sell from her Grant Street apartment.

The defendants argue that this kind of overlap does not evince a conspiracy, because people played different roles with respect to the different dealers, demonstrating that there was no overarching agreement. Osborne recruited customers for everyone, but only sold heroin for Jordan and Canty. He only testified to working the door at Oak Street, where Cruz did not sell drugs, and not the other two trap houses. Jordan maintained romantic relationships with Tweedie and Santiago while using their apartments as trap houses, while Lawson merely showed up at Grant

- 38 -

Street and refused to leave and sold drugs at Redbank despite Tweedie telling him not to.

While there were certainly "consistent participants" in these activities, see Mangual-Santiago, 562 F.3d at 422, there was not a high degree of organization or anyone in a "leadership and coordinator role," id. There was evidence of overlap, but it lacked characteristics which would lead to strong inferences of an agreement among the participants.

### iv. Totality of the evidence

In addition to individual determinations of common goals, interdependence, and overlap, "this court has looked beyond any such lists of factors to 'the totality of the evidence' in determining whether there is factual support for a finding of a single conspiracy." Portela, 167 F.3d at 696 (quoting United States v. Drougas, 748 F.2d 8, 17 (1st Cir. 1984)).

The totality of the evidence of conspiracy here was not in our view sufficiently strong to overcome the prosecutor's errors. See Arrieta-Agressot, 3 F.3d at 530 (reversing on plain error where "the [prosecution's] case was adequate but not overwhelming, and the jury may have been swayed by the prosecutor's impermissible rhetoric"). While there was ample evidence that Canty and Jordan distributed heroin, and strong evidence of various smaller conspiracies, the government had to prove the single conspiracy charged in the indictment. A jury could find a single

overarching conspiracy on the evidence here.  However, the evidence was at least as strong that Cruz, Canty, Lawson, and Jordan operated independently and indifferently to one another rather than in tandem, selling when and where it was convenient to do so with no overall coordination of effort and no agreement, tacit or otherwise, to assist one another in distributing drugs.  Moreover, some of the government witnesses gave conflicting testimony.

Because the evidence in the case was not overwhelming, the improper arguments by the prosecutor "so poisoned the well that the trial's outcome was likely affected, thus warranting a new trial."  Azubike, 504 F.3d at 39 (internal quotation marks omitted) (quoting Joyner, 191 F.3d at 54).  Many of the prosecution's improper statements went to the heart of the case.  The emotional appeals to the jury's role as the conscience of the community and the guilt-by-association arguments encouraged the jury to abandon its role as rational factfinder and to judge the case based on negative feelings towards the defendants.  This was exacerbated by the improper attribution of video evidence pertaining only to Jordan as pertaining to both defendants.  The prosecutor's improper vouching unfairly bolstered the credibility of the government's witnesses who provided crucial evidence in the case, and whose credibility the defendants attacked in order to defend against the charges.  The bulk of the improper arguments

were made during rebuttal, the very last time the jury heard argument from either party.

As to the fourth prong of plain error review, where such a likelihood of conviction on the basis of improper arguments exists, we are compelled to find that the fairness, integrity, and public reputation of the proceedings have been seriously affected.

"[F]ederal prosecuting attorneys ought to be mindful of the harm done when those in power ignore the rules governing their own conduct while demanding strict compliance from others." Arrieta-Agressot, 3 F.3d at 530. The government in criminal prosecutions must follow the rules and suffer the consequences when it does not.

## IV.

For the reasons stated above, we conclude that to let these convictions stand would have a serious deleterious effect on the fairness, integrity, and public reputation of judicial proceedings. See United States v. Acosta 924 F.3d 288, 309 (6th Cir. 2019). We affirm the denial of the motions for acquittal. We reverse the denial of the new trial motion and remand for further proceedings consistent with this opinion.