# United States Court of Appeals
## For the First Circuit

No. 24-1206

UNITED STATES OF AMERICA,

Appellee,

v.

LESTER ACEITUNO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya B. McCafferty, U.S. District Judge]

Before

Gelpí, Lynch, and Thompson,
Circuit Judges.

Zainabu Rumala, Federal Public Defender Office, on brief for
appellant.

John J. McCormack, Acting United States Attorney, Matthew T.
Hunter, Assistant United States Attorney, and Geoffrey W.R. Ward,
Assistant United States Attorney, on brief for appellee.

June 2, 2025

**LYNCH**, **Circuit Judge**.  After a jury trial in 2024, Lester Aceituno was convicted of conspiracy to commit bank fraud under 18 U.S.C. §§ 1344, 1349 and of two counts of aggravated identity theft under 18 U.S.C. § 1028A and sentenced to 30 months in prison.  On appeal, he contends that (1) the district court erred in denying his Rule 29 motion which argued that there was insufficient evidence to prove beyond a reasonable doubt that he knew he was using identifying information of a real person, as is required for an aggravated identity theft conviction, and (2) the government's closing argument, to which there was no objection, and its rebuttal to defense counsel's closing constituted prosecutorial misconduct such that he is entitled to a new trial.  We reject his arguments and affirm his conviction.

## I.  Background

### A.  Sufficiency of the Evidence

As to the first argument, we recount the facts "in the light most hospitable to the verdict, consistent with record support."  United States v. Carmona, 103 F.4th 83, 86 (1st Cir. 2024) (quoting United States v. Concepcion-Guliam, 62 F.4th 26, 29 (1st Cir. 2023)).

Between June 2016 and October 2017, at least four individuals engaged in a fraudulent check-cashing scheme in Georgia, Massachusetts, and New Hampshire.  The scheme was led by a man, Ibiloya, known as "Abby."  Abby provided Aceituno and other

conspirators with stolen means of identification of real people including names, social security numbers, dates of birth, and counterfeit driver's licenses displaying the conspirator's photographs along with the stolen information. The conspirators used that information to open bank accounts, change the addresses associated with those accounts to rented mailboxes obtained under similar pretenses, and to deposit fraudulent checks. The conspirators then had debit cards shipped to the new addresses and used those cards to access the funds. Aceituno opened such accounts in New Hampshire and Massachusetts using stolen means of identification of real people. He signed signature cards to open such accounts attesting the information was accurate. He also created a mailbox and retrieved a debit card using stolen means of identification of real people for the conspiracy's use.

Chinedu Ihejiere, a co-conspirator, testified for the government. Ihejiere testified that Abby gave him fraudulent checks made out in the name of the account holder which were deposited in the accounts, and after the checks were deposited, co-conspirators withdrew the funds using the debit cards issued from those accounts. Ihejiere and Abby split the withdrawn funds, with Abby receiving 75% and Ihejiere receiving 25%. Ihejiere, who had previously been convicted for other fraud and identity-related offenses, testified that the success of the scheme depended on

Abby's identities being real: "[i]f [the information] wasn't real, [the accounts] would not open."

On June 1, 2016, Aceituno opened a bank account at Eastern Bank in the name of Tyler Teggatz. He opened another bank account with Eastern Bank in the name of Johnathan Brome on November 2, 2016. Teggatz and Brome, both real people, did not know Aceituno and did not authorize him to open accounts in their names. In October 2016 and February 2017, respectively, Aceituno also opened accounts in the names of David A. Johnson and David R. Johnson, real persons. The real David A. Johnson did not testify, but David R. Johnson testified that he did not know Aceituno and had not authorized him to open a bank account for him.

When Aceituno opened the accounts, he provided Eastern Bank with real names, dates of birth, and social security numbers. He also signed their names to signature cards, certifying "[u]nder penalties of perjury" that the cards contained "my correct taxpayer identification number." The cards further stated:

> Federal law requires us to obtain sufficient information to verify your identity. You may be asked several questions and to provide one or more forms of identification to fulfill this requirement. In some instances, we may use outside sources to confirm the information. The information you provide is protected by our privacy policy and federal law.

Patrick (Pat) Childs, an Eastern Bank employee, testified that Eastern Bank's standard procedure required it to

run the provided identification information through ChexSystems, a program which confirms the social security number's authenticity and year of issuance. Eastern Bank declines to open the account if ChexSystems indicates that the number has not been issued, and the program checks for other discrepancies as well. In addition to the notice on the signature cards, Eastern Bank makes persons who open accounts aware of this verification process through multiple means: it verbally informs customers that it will run their information through ChexSystems, and it places placards at customer service desks with the same information.

In April 2017, Aceituno created a mailbox at a check-cashing business in East Boston using the identification information of Jonathan Smith, a real person. In doing so, Aceituno filled out a postal service form and provided a false driver's license with Smith's identification information. Abby subsequently gave Ihejiere the mailbox key, and Ihejiere received debit cards and other bank materials at the mailbox.

The conspirators attempted to use each of the accounts that Aceituno opened before Eastern Bank investigated and then froze the accounts.[1] As to the Teggatz account, by July 25, 2016, the conspirators had obtained a debit card for the account and

_____

[1] The government did not introduce evidence about the conspirators creating mailboxes under the names of Teggatz, Brome, David A. Johnson, or David R. Johnson.

- 5 -

were making deposits. In August of 2016, Ihejiere deposited checks for $12,012.16 and $19,945.09, and the conspirators made withdrawals until one of the checks bounced. At that point, Eastern Bank reached out to law enforcement. As to the David A. Johnson account, a conspirator called Eastern Bank multiple times attempting to obtain a debit card before the bank froze the account. The conspirators also attempted to obtain a debit card for the Jonathan Brome account, but Eastern Bank froze the account before the conspirators could make any deposits besides the opening deposits. Eastern Bank froze the David R. Johnson account after Ihejiere deposited a $22,126.45 check.

In early 2017, Ihejiere met Aceituno with Abby for the first time in person. Sometime after that meeting, Abby invited Ihejiere to come to Atlanta "to make some money." Ihejiere testified that Abby told Aceituno to pay for one of his flights to Georgia. While in Georgia, Ihejiere opened a bank account at Fifth Third Bank under the name of Paul Vansambeek, a real person. Abby and Aceituno were present when Ihejiere then created a mailbox in Vansambeek's name, and Abby told Ihejiere that Aceituno would retrieve documents from the mailbox. Ihejiere later received an ATM card and pin number for the account through the mailbox. Upon returning to Massachusetts, Aceituno deposited Ihejiere's share of the funds from the Vansambeek account in Ihejiere's personal account.

- 6 -

## B. Closing Argument and Rebuttal

We describe the prosecution's statements challenged by Aceituno and the context in which they were made including the statements in closing by defense counsel, which were responded to in the government's rebuttal. The prosecution made a number of statements related to Pat Childs's testimony during closing arguments:

1. "[Aceituno] stood there in front of a placard. Now, remember Pat Childs told you that there were placards in the Eastern Bank branches telling customers that their information would be run through that ChexSystems system and it would be run at the time of the opening of the account. The defendant stood there and was told as well by a bank employee again, remember Pat Childs's testimony, that the information he provided would be run, would be checked through that system. He doesn't leave. You saw no sign in the video and in the stills that he flinched and ran out of there."

2. "[Aceituno] once again went by and sat near those placards, heard that warning from the bank employee that the information he provided would be run and would be checked."

3. "[Aceituno] again was given warnings and was undeterred" and "[t]he warnings he was given did not deter him."

4. "Kara Mann, way back on Monday, the Fifth Third Bank employee you heard from first, showed you, as did Pat Childs, the signature cards for the bank account openings. And there's two signatures, you will recall, on each of those cards. And what they both told you was that the second signature on the account opening form is a certification that the Social Security number provided is correct. That's actual knowledge because anyone filling out that form, including the defendant when he filled out those forms, is being told that the Social Security number must be a real number, not just some made-up nine digit number."

Aceituno did not object to any of these remarks.

The defense's closing included the following statements:

- 7 -

1.	"But I do need to talk to you about something that may happen in the deliberation room just based on human experience and ask you to resist that.  You know, in 2004 there was an earthquake that caused a tsunami.  Just in Indonesia 170,000 people were killed.  I actually remember that day looking on my computer at this news of this terrible event.  A couple of hours later I was going on with my life.  You know, you get absorbed in your own concerns."

2.	"Almost exactly 400 years ago Sir Walter Raleigh was accused of treason and ultimately executed in London.  The evidence against him was that there was a Baron Cobham who was interrogated outside the presence of Sir Walter Raleigh, and he claimed, or he was made to, it's not clear, write out that he and Raleigh had agreed to treason.  To kill King James I, basically.  At Raleigh's trial he said bring my accuser face-to-face.  He was denied that right, and he was put to death.  But after that case 400 years ago there was a widespread belief in England that that is the wrong way to try people.  That if you are accused of a crime, you should meet your accuser face-to-face."

The prosecution, in response to defense counsel's several references to events distant in time and place from the case, stated: "[y]ou heard a closing that spent a lot of time talking about a lot of things that did not happen in this courtroom and that are not evidence in front of you.  That is to confuse and distract you."  Aceituno objected, and the court overruled the objection.  The prosecution continued: "[t]he defendant was given the fair trial required under the Constitution.  The government has met the burden required under the Constitution to prove his guilt beyond a reasonable doubt.  Not confusion about tsunamis and Sir Walter Raleigh."

## II. Analysis

### A. <u>Sufficiency of the Evidence</u>

We review sufficiency challenges de novo, construing the evidence in the light most favorable to the verdict. <u>United States</u> v. <u>Morel</u>, 885 F.3d 17, 22 (1st Cir. 2018).

The aggravated identity theft statute, 18 U.S.C. § 1028A, applies when one "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person" in relation to certain enumerated offenses including conspiracy to commit bank fraud. <u>See</u> 18 U.S.C. §§ 1028A(a)(1), 1028A(c)(5). The Supreme Court has held that the offense requires a showing that the defendant knew that the "means of identification" used belonged to "another person." <u>Flores-Figueroa</u> v. <u>United States</u>, 556 U.S. 646, 647 (2009) (quoting 18 U.S.C. § 1028A(a)(1)). The prosecution bears the burden of showing that the defendant "knowingly" committed these acts. <u>See</u> <u>United States</u> v. <u>Valerio</u>, 676 F.3d 237, 244 (1st Cir. 2012) (citing <u>Flores-Figueroa</u>, 556 U.S. at 657).

Viewed in "the aggregate," <u>United States</u> v. <u>Olbres</u>, 61 F.3d 967, 974 (1st Cir. 1995), we hold that sufficient evidence supports the jury's finding beyond a reasonable doubt that Aceituno "knowingly transfer[red], possesse[d], or use[d], without lawful authority, a means of identification of another person" in relation to certain enumerated offenses that include conspiracy to commit

- 9 -

bank fraud. See 18 U.S.C. § 1028A(a)(1). We start with the evidence of his opening of the Eastern Bank accounts, having been informed that the identification information he provided would be scrutinized. "The fact that [the defendant] knew that the [identity information] might be subjected to scrutiny . . . supports the inference that he knew that the [information] belonged to a real person." United States v. Soto, 720 F.3d 51, 55 (1st Cir. 2013); see also Valerio, 676 F.3d at 244-45 (holding that "[a] 'willingness to subject [a] social security card repeatedly to government scrutiny' is evidence that allows a reasonable jury to find that a defendant knew that a stolen identity belonged to a real person" (second alteration in original) (quoting United States v. Holmes, 595 F.3d 1255, 1258 (11th Cir. 2010))).

The evidence, including the signature cards that Aceituno signed and the testimony about Eastern Bank's practice of notifying customers that it checks identification information, supports the jury's conclusion. Aceituno argues that no such inference is warranted because he did not subject the means of identification of a particular real individual to scrutiny more than once. Aceituno is incorrect. Aceituno subjected means of identification obtained through the conspiracy to scrutiny at least five separate times. See Morel, 885 F.3d at 23 ("This court has previously found sufficient evidence of a defendant's

knowledge that an identity was real where the defendant repeatedly subjected that identity to scrutiny. Although [the defendant] only cashed a single refund check made out to JRM, the evidence showed that the scheme in which [the defendant] participated involved hundreds of fraudulent tax refund transactions." (citation omitted)). We need not decide whether the use of means of identification of five individuals is sufficient because there was much more evidence from which the jury could draw inferences.

Aceituno's use of multiple means of identification -- names, dates of birth, and social security numbers -- also supports the jury's conclusion. See Valerio, 676 F.3d at 244 (defendant used both birth certificate and credit reports).[2] Aceituno also used means of identification of at least five people in opening accounts and mailboxes.[3] Moreover, Aceituno observed Ihejiere successfully create a mailbox with personal identifying information about another real person, and Ihejiere understood (and a jury could infer he passed that understanding to Aceituno) that the scheme's "*modus operandi* was to involve people [known] to be real." Soto, 720 F.3d at 56. To be clear, we do

---

[2] The government also argues that indeed Aceituno's very success in opening accounts showed that he knew that the scheme used means of identification from real people.

[3] The government did not charge Aceituno with aggravated identity theft for his opening of the two David Johnson accounts and the Jonathan Smith mailbox, but those actions remain relevant and material evidence.

- 11 -

not hold that all of this evidence was necessary to sustain a conviction.

Aceituno primarily argues that the evidence is insufficient because there is no direct evidence that he knew that these means of identification were of real people. This argument does not suffice: we have held that "knowledge [that the 'means of identification' belonged to 'another person'] may be proven by circumstantial evidence alone; indeed, it frequently cannot be proven in any other way." See Valerio, 676 F.3d at 244 (quoting United States v. Agosto-Vega, 617 F.3d 541, 549 (1st Cir. 2010)). He also argues that the evidence is insufficient because he was not the one who generated the means of identification; instead, he received the materials from someone else. That does not mean that he lacked the requisite knowledge. See, e.g., Morel, 885 F.3d at 20, 21-23 (holding that sufficient evidence existed to affirm conviction for aggravated identity theft where defendant did not personally generate the means of identification).

Aceituno's remaining arguments, that the fact that he "did not use the same identity more than once further weakens any inference of knowledge that the identities used were of real persons," and there was "[no] evidence that Aceituno made any statement demonstrating his knowledge of the authenticity of the identities," likewise fail. We have held that such evidence can support a conviction for aggravated identity theft, not that such

evidence is necessary to convict.  See Valerio, 676 F.3d at 244; see also United States v. Núñez-Polanco, 428 F. App'x 13, 15 (1st Cir. 2011).

Aceituno also incorrectly argues that his position is supported by United States v. Godin, 534 F.3d 51, 54 (1st Cir. 2008).  There, the only evidence introduced by the prosecution was that the defendant had opened bank accounts using seven different social security numbers that she had fabricated "by altering the fourth and fifth digits of her own social security number."  Id. Godin held that "[t]he only inference a rational jury could make from this evidence is that [the defendant] randomly selected the two fabricated numbers."  Id. at 62.  Here, the evidence as described above is much more compelling, and there is no evidence that Aceituno randomly generated (much less from his own personal data) any of the means of identification he used.

## B.  Closing Arguments

Aceituno further argues that, even if the evidence was sufficient to sustain his convictions, certain of the government's statements at summation constitute prosecutorial misconduct and entitle him to a new trial.  Because Aceituno did not object at trial, we review these challenges for plain error.  See United States v. Canty, 37 F.4th 775, 790 (1st Cir. 2022). We ask whether "(1) . . . an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights,

but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  Id.

We start and end with the first prong.  The statements were not improper.  The prosecution's statements that Eastern Bank warned Aceituno about ChexSystems, were not, as Aceituno argues, "unsupported by any evidence."  Id. at 789 (quoting United States v. Azubike, 504 F.3d 30, 38 (1st Cir. 2007)).  Rather, the statements were fair inferences from the evidence that Eastern Bank had a practice of notifying customers about ChexSystems verbally and through placards.  See United States v. Vanvliet, 542 F.3d 259, 271 (1st Cir. 2008) ("The prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence." (quoting United States v. Werme, 939 F.2d 108, 117 (3d Cir. 1991))).  In the first and fourth challenged statements, the government identified Childs's testimony about the bank's practices as the relevant evidence.  In the remaining two challenged statements, the context made it clear that the prosecution was arguing an inference based on Childs's testimony rather than representing that other direct evidence existed.  See United States v. Carpenter, 736 F.3d 619, 627 (1st Cir. 2013) ("While the government did not say explicitly that it was asking the jury to draw an inference from the documents and facts, that was the structure of the argument as a whole.").

We review the propriety of the government's rebuttal statements, to which Aceituno did object, de novo. See United States v. Ayala-García, 574 F.3d 5, 16 (1st Cir. 2009). Contrary to Aceituno's arguments, the prosecution did not mount any "unsubstantiated, personal attack on defense counsel." The government was responding to defense counsel's reference to a 2004 tsunami in Indonesia and the trial of Sir Walter Raleigh 400 years ago in England, each of which were far afield from the facts in this case. The prosecution's rebuttal was meant to redirect the jury's attention to the facts of this case. See United States v. Barragan, 871 F.3d 689, 703 (9th Cir. 2017) ("Criticism of defense theories and tactics is a proper subject of closing argument." (quoting United States v. Sayetsitty, 107 F.3d 1405, 1409 (9th Cir. 1997))); see also United States v. González-Pérez, 778 F.3d 3, 20 (1st Cir. 2015) ("The prosecutor's further suggestions that defense counsel was trying to confuse the jury . . . while perhaps impolitic, did not render the trial unfair."); United States v. Wilkerson, 411 F.3d 1, 9 (1st Cir. 2005) ("[Defendant's] claim that the prosecutor demeaned the defense by calling one of the defense theories a 'red herring' is meritless."); United States v. Bennett, 75 F.3d 40, 46-47 (1st Cir. 1996) (holding that prosecutor's remarks that defense argument was a "diversion" that

did not "pass the laugh test" did not "cross[] the line").[4]  It was fair commentary that the defense's statements were meant "to confuse and distract [the jury]."

        We **affirm**.

_____

[4] Aceituno argues that United States v. Manning, 23 F.3d 570 (1st Cir. 1994) supports his position, but Manning involved "pervasive" "prosecutorial overrreaching" not at issue here. Id. at 575.  The Manning prosecution's closing included improper witness-vouching, implications that the prosecution had inculpatory information that was not in evidence, and far more denigrating statements than those made in this case: there, the prosecution represented to the jury that the "role" of defense counsel was "to cloud the issues or make smoke screens," and "liken[ed] them to Shakespeare's players, full of sound and fury signifying nothing." Id. at 572-73, 573 n.1.